218 So.2d 98 (1969)
Mrs. Louise O. MEYNIER
v.
DE PAUL HOSPITAL, Daughters of Charity of St. Vincent De Paul, Dr. William R. Sorum and Insurance Company of North America.
No. 3230.
Court of Appeal of Louisiana, Fourth Circuit.
January 6, 1969.
*99 Edward J. Norton, Jr., New Orleans, for plaintiff-appellee.
Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, Allen R. Fontenot, New Orleans, for defendants-appellants.
Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, H. Martin Hunley, Jr., New Orleans, for defendant-appellee, Dr. William R. Sorum.
Before SAMUEL, HALL and JOHNSON, JJ.
JOHNSON, Judge.
On April 10, 1963, plaintiff was given two shock treatments within a period of a few minutes by Dr. William Sorum, a psychiatrist. Plaintiff remained unconscious for about fifteen minutes after which she was in bed for about an hour. Then a lady attendant was in the process of leading her down a flight of six (as shown by the photographs) risers or stairsteps when plaintiff fell causing a fracture of her left ankle. Plaintiff filed this suit in tort against Dr. William Sorum, De Paul Hospital, Daughters of Charity of St. Vincent De Paul, operator of the hospital, and Insurance Company of North America, the hospital public liability insurer. After trial the Civil District Court for the Parish of Orleans rendered one judgment in two parts. One part is in favor of Dr. Sorum dismissing the suit as against him and the other part is in favor of plaintiff and against the other three defendants in solido awarding damages to plaintiff in the sum of $4,298.93, with interest. The judgment specified $3,500.00 for "pain and suffering" and $798.93 for expenses. There was no appeal by the plaintiff from the judgment in favor of Dr. Sorum and that part of the judgment dismissing the suit as against him is final. The other three defendants have appealed.
Plaintiff's petition alleges that plaintiff was brought to De Paul Hospital at 7:30 a. m. by her daughter for shock treatment; that after the treatment was administered by Dr. Sorum she remained in the recovery room for about an hour; that the recovery room was in charge of a registered nurse and a lady attendant or aide, both of whom were employees of the hospital; that after plaintiff awoke she was not placed in a *100 wheel chair, but rather she was compelled to walk under her own power assisted by the aide. The petition particularly alleges that defendants failed to provide adequate standards of protective safety consistent with the needs of plaintiff, in that defendants failed to enact any special precautions, knowing that plaintiff was 72 years of age; failed "to provide mechanical ambulatory aids" after such severe mental and physiological experience; failed to provide a safe and uncomplicated route by which plaintiff could leave the hospital and deliberately forced plaintiff to walk down the cumbersome and hazardous stairs; failed to provide a competent escort; failed to distinguish the lack of coordination of electroshock treatment patients and failed to give special consideration and provide sufficient safeguards for the protection of plaintiff in view of her natural retarding recovery processes because of her advanced age.
Briefly, the facts developed by the evidence are that for 15 years, beginning about 1948, plaintiff suffered periods of mental and emotional depression. She sought treatment by medical doctors and psychiatrists but got no relief from any of them except from those who administered the electroshock treatments. She took these treatments in series of seven treatments in about ten to fourteen days. On some occasions she would not complete the full seven treatment series. The treatments definitely afforded considerable relief for a time but the duration of the relief and the time between these episodes of depression varied. After her husband died in 1949, she sometimes lived alone and when her mental condition required it she would live with one of her two daughters in New Orleans. For a while she stayed as a patient in De Paul Hospital. Her daughter testified that plaintiff was not financially able to continue in the hospital and arrangements were then made to have the treatments administered to plaintiff as an outpatient. When plaintiff would become depressed, arrangement would be made for Dr. Sorum to administer the treatments at De Paul Hospital. Each treatment was followed in a day or two by another until a maximum of seven treatments were given at that time. One of the daughters would take plaintiff to the hospital in an automobile. She was delivered to an attendant of the hospital at a designated entrance, most generally at Henry Clay Avenue, and the daughter would either wait for her mother or would leave and return for her in about an hour and a half or two hours.
The treatment room was at the other end of a wing of the hospital building at Calhoun Street and on the same floor of the reception room at the Henry Clay Avenue entrance, where the attendant took charge of plaintiff upon arrival. Instead of going along the hall on the same floor to the treatment room plaintiff was made to walk down a ramp into a courtyard and then on the ground along the side of the wing of the building some 100 feet or more to a door leading from the courtyard into a vestibule, up the flight of six stairs into another small room, then through the recovery room into the treatment room.
This day, April 10, 1963, plaintiff received the fourth treatment of the series being given her. Dr. Sorum administered one electric impulse of 140 volts but he said it had not produced complete convulsive shock and he administered a "repeat" impulse of 140 volts almost immediately. Plaintiff was given two medications, atrophine, about a half hour before the treatment, and another drug a few seconds before the treatment to soften muscle contraction so as to prevent possible damage to the person when in convulsive shock produced by the electric current. After the treatment plaintiff was kept in the recovery room for about an hour. When plaintiff recovered consciousness she was given coffee and aspirin. The patients in the recovery room were in charge of a registered nurse who had assisted in giving the treatments. Mrs. Weingerter, who was not a registered nurse but who had served as an attendant or aide for some 13 years in this department, was on duty on this *101 occasion. She assisted plaintiff to dress and led her to the door to go down the stairs to begin the trip in reverse by which she entered. There is a hand rail on the right going down the steps and Mrs. Weingerter was at plaintiff's left side with plaintiff's left elbow resting in the cup of the attendant's right hand which was described as such a hold as one would use to guide another in a given direction. From that description it is reasonable to assume that there was really little or no assistance being afforded to plaintiff going down the stairs. At any rate, when they were about half way down the flight plaintiff fell causing the fracture of her ankle. The hospital made an X-ray and kept plaintiff in the hospital until about 12:00 o'clock when she was transported to Touro Infirmary for treatment by Dr. Levy, an orthopedic surgeon.
Dr. Sorum said that after giving such a treatment he would see the patient in the recovery room and if he found that the patient was breathing well and apparently in good condition he would leave the patient in charge of the nurse and her aide. On this occasion he left the hospital. He was asked if plaintiff was confused after the treatment and he testified there would be some residual confusion which he explained means that someone should help her down the stairs and to get home. It is assumed that the doctor was speaking generally because he was not there personally and did not see plaintiff when she left the recovery room. His most significant statement, evidently based on his experience with this patient particularly, was in answer to the question as to whether Mrs. Meynier was semi-lucid at that time and he said that she would not be that lucid so as to manipulate totally on her own or find her way to the front of the building through corridors or downstairs.
The graduate nurse on duty on this occasion testified that she could not remember specifically seeing plaintiff after her treatment and while plaintiff was in the recovery room, but that it was one of her duties to stay in the recovery room at least until all of the patients had coffee and aspirin. We take that to mean that the nurse might have left as soon as plaintiff regained consciousness and before the end of plaintiff's bed rest. This plaintiff was the last patient to leave the recovery room. The nurse was called after the accident and said she found plaintiff sitting on the first or second step from the bottom and that plaintiff was lucid and cognizant of her surroundings. Other testimony was that plaintiff fell down the steps to the floor. Dr. Sorum testified, as noted above, that at the time plaintiff left the recovery room she would have been less than semilucid. The nurse said that after the accident she noticed that the shoe plaintiff was wearing was a pump with a heel about one and one-half inches high, worn to one side, and that the shoe was torn at the instep. We cannot accept that as any proof that the condition of the shoe caused the fall. The shoe may have been torn in the fall. There is no evidence that the heel caused any difficulty in walking.
This nurse assisted in the administration of the treatment given plaintiff and knew that she had been given two electric shocks instead of the usual one. She knew also of plaintiff's advanced age. We think these special facts would place this plaintiff in an individual category requiring closer supervision than ordinarily necessary. The hospital records filed in evidence show that from August 11, 1961, to April 10, 1963, the date of this accident, a period of 20 months, this plaintiff had received 20 shock treatments. Six of them were "repeats". Such facts, coupled with her advanced age and the long duration of her mental condition, strongly indicate that plaintiff should not have been required to walk downstairs or should have had special and adequate assistance. Plaintiff's daughter said that plaintiff's ability to recover from these shock treatments was becoming slower than formerly. She should have been transported in a wheel chair. This is a matter of common sense and it *102 is not necessarily the exercise of professional judgment. The nurse and attendant should have been more attentive to such necessities under the known facts and circumstances. No good reason was given why the patients from the recovery room could not have been sent along the hall of that wing on the same floor of the recovery room to the Henry Clay Avenue entrance where the reception room is also on the same floor. It was suggested in argument that hospital patients in this wing were geriatrics in various conditions, but we fail to understand why that would prevent those who are able to walk or ride in a wheel chair from being sent along that hall, a much shorter, level and direct route, the route by which plaintiff was carried in a wheel chair twice after this accident on that same morning. Failing in these things or in any one of them would and did constitute gross negligence for which the hospital and its operators are responsible. From the evidence, it is apparent that plaintiff was mentally helpless and completely incompetent to use any discretion of her own for her own safety. There was not the exercise of ordinary care for the safety of this plaintiff to which she was entitled.
Dr. Edwin Fuchs, a psychiatrist and medical director of De Paul Hospital, testified with reference to a general standard of behavior on the part of patients after shock treatment and that the hospital employees are instructed to guard against falls and collapses. He could not speak specifically about plaintiff's posttreatment condition, but admitted that a 72-year-old person would be expected to be more confused after shock therapy than a younger person and that there are potential dangers of patients hurting themselves after receiving such treatment.
We do not suggest or imply that the hospital is an insurer of a patient's safety. We do believe that this plaintiff, as a so-called outpatient is entitled to the same degree of care and assistance that would be due under similar circumstances to a bed patient, one residing in the hospital.
The hospital must exercise the reasonable care toward a patient as the patient's known condition may require. Plaintiff's condition and the facts and circumstances peculiarly applicable to this plaintiff on this particular occasion were all well known to the hospital employees who had her in charge. The hospital is liable for the results of the want of ordinary care whether the failure to exercise such care is due to incompetence or nonperformance of duty by the employee. This extends to safeguarding the patient from dangers due to mental and physical incapacity. If the hospital, through its employees, does something which it should not have done or failed to do something which it should have done as the result of negligence or inattention, amounting to less than reasonable and ordinary care of the patient, the hospital must be held liable for the consequences. 41 C.J.S. Hospitals § 8, p. 349, and notes.
Counsel for defendants seems to rest his defense on the illustrations of professional and nonprofessional error recited in Messina v. Societe Francaise De Bienfaissance, etc., La.App., 170 So. 801, and argues that in order to be able to hold the hospital liable the act or nonaction of the employee which results in the damage complained of must be a nonprofessional error. He further argues that there was no error in this case on the part of Mrs. Weingerter, the attendant, or of the nurse, for the reason that they were strictly obeying Dr. Sorum's orders. There is no evidence that Dr. Sorum had ordered that plaintiff be made to walk down the stairs, through the courtyard and up a ramp to the reception room at Henry Clay Avenue. If the hospital had ordered it, regardless of circumstances, *103 and the employees were strictly following orders, then the hospital administrators are primarily at fault. The evidence is to the effect that different shock treatment patients respond differently according to the individual and must be so attended. Moreover, in the Messina case, the example of the interne having been instructed to give a patient strychnine and by error he gave another drug, thereby constituting a nonprofessional error with liability on the hospital or the doctor who gave the instructions, is a perfect illustration of what took place when this plaintiff by gross error on the part of the hospital employees was marched down these steps when she was in a weakened and confused condition because of her having taken two shock treatments, because of her age and other circumstances shown by the evidence. The employees violated the instructions of the hospital that they should guard against such falls and should attend to each individual according to the needs. She should not have been compelled to make this hazardous trip which was started by descending this flight of stairs, particularly when a level, direct and shorter and easy route was available.
Plaintiff answered the appeal to ask for an increase in the award. Plaintiff suffered a painful and disabling fracture which required surgery to install permanent metal pins. She wore casts for a total of 12 weeks. She was under Dr. Levy's care for several months during which time she had some residual ankle swelling and arthritis. The award fixed by the trial court is certainly not excessive and we cannot determine from the evidence that it is insufficient.
For these reasons the judgment appealed from is affirmed with cost to be paid by defendants-appellants.
Affirmed.