336 So.2d 521 (1976)
Cecil PETTIS, Plaintiff-Appellant,
v.
STATE of Louisiana, Through State DEPARTMENT OF HOSPITALS, et al., Defendants-Appellees.
No. 5419.
Court of Appeal of Louisiana, Third Circuit.
June 4, 1976.
Rehearings Denied on Applications July 1, 1976.
On Rehearing August 20, 1976.
Writs Refused September 24, 1976.
Rehearings Denied September 28, 1976.
Writs Granted In Part and Denied In Part December 3, 1976.
*523 William Henry Sanders, Jena, Edward A. Kaplan, Alexandria, for plaintiff-appellant.
Adams & Reese, by Harold A. Thomas, New Orleans, Lawrence W. Bell, Baton Rouge, Gold, Hall, Hammill & Little, by James D. Davis, Alexandria, for defendants-appellees.
Provosty & Sadler, by LeDoux R. Provosty, Jr., Alexandria, for defendants-exceptors.
Before HOOD, GUIDRY and PETERS, JJ.
Rehearings Denied on Applications of Dr. Kent, Cecil Pettis and Kirkpatrick & Tri-State Insurance Company, July 1, 1976.
HOOD, Judge.
Cecil Pettis claims damages for personal injuries sustained by him while he was being treated in the Central Louisiana State Hospital. The defendants are: (1) State of Louisiana, through the Louisiana Health and Human Resources Administration (Successor to State Department of Hospitals, and Central Louisiana State Hospital); (2) Dr. Arthur L. Seale; (3) Dr. Earl H. Kent; (4) Dr. William L. Kirkpatrick, and (5) Tri-State Insurance Company (insurer of Dr. Kirkpatrick). Although Dr. Harvey B. Henry was originally named as a defendant, the suit subsequently was dismissed as to him. Answers were filed by all defendants. One of them, State of Louisiana, filed a third party demand seeking to recover from defendants Kent and Kirkpatrick any amounts which the State may be condemned to pay plaintiff.
*524 The case was tried before the trial judge alone insofar as it related to plaintiff's claim against the State of Louisiana. It was tried by jury insofar as it related to his demands against all other defendants. The trial judge concluded that plaintiff was not entitled to recover from the State, and the jury returned a verdict in favor of the other defendants. Judgment was rendered by the trial court in favor of all defendants dismissing plaintiff's suit. The judgment also dismissed the State's third party demand. Plaintiff appealed.
The State answered the appeal, praying that in the event the judgment of the trial court is reversed or modified its third party demand be maintained, and that judgment be rendered in favor of the State against the third party defendants for any amount which the State might be condemned to pay plaintiff.
This case was before us on a prior occasion. The trial court rendered a summary judgment of January 22, 1973, dismissing the suit as to the State of Louisiana, and it rendered another judgment on January 23, 1973, sustaining exceptions of no cause of action filed by defendants Seale, Kent and Kirkpatrick. Plaintiff appealed. We reversed both of those judgments and remanded the case to the trial court for further proceedings. Pettis v. State Department of Hospitals, 281 So.2d 881 (La.App. 3 Cir. 1973).
A number of issues are presented on this appeal, the principal ones being: (1) Were defendants Seale, Kent and Kirkpatrick, or any of them, negligent in having failed to exercise the proper degree of skill in treating plaintiff? (2) Were the nurses or employees of Central Louisiana State Hospital negligent in having failed to exercise the proper degree of skill in administering to or caring for plaintiff?
During the early part of 1971 Pettis experienced some mental problems while living with his sister, Mrs. Lucille Smith, in Union Parish, Louisiana. A social worker suggested that he seek psychiatric treatment, and in response to that suggestion he went to the Mental Health Center at Ruston, Louisiana, where he was accepted as a welfare client. The health center arranged for him to be admitted to Confederate Memorial Hospital, in Shreveport, where he remained for approximately two weeks.
On April 26, 1971, Mrs. Smith signed an application for Pettis to be admitted to the Central Louisiana State Hospital in Pineville, for observation, care and treatment. The coroner of Union Parish and another physician certified that plaintiff was in need of observation, care and treatment for mental illness, and they recommended that he be committed to a mental hospital. On the basis of the above application and certificate, the district judge in Union Parish issued an order directing that Pettis be committed to the Central Louisiana State Hospital, pursuant to the then existing provisions of LSA-R.S. 28:52. Plaintiff thereupon was transported by a deputy sheriff of Union Parish from the Confederate Memorial Hospital, in Shreveport, to the Central Louisiana State Hospital, in Pineville.
Plaintiff was admitted to Central Louisiana State Hospital on May 10, 1971. On that date he received a psychiatric or mental examination, and on the next day, May 11, he was given a complete physical examination. Following those examinations, a provisional diagnosis of schizophrenia, chronic undifferentiated type, was made and a tentative treatment plan for Pettis was outlined.
On May 11, 1971, Pettis was transferred from the admissions unit to the intensive psychiatric care unit of the Central Louisiana State Hospital. Dr. Leroy Kirkpatrick, a medical doctor who specializes in psychiatry, was director of that unit. Dr. Earl H. Kent, a licensed physician, was employed by the hospital and he worked under the direction of Dr. Kirkpatick in the intensive psychiatric care unit. Several *525 registered nurses, practical nurses and attendants also worked in that unit.
Upon the arrival of plaintiff in the intensive psychiatric care unit, he was given an EKG, and dorsal spinal x-rays were taken. The x-rays of his spine were normal, except that they showed a scoliosis of the back. Plaintiff underwent some chemotherapy treatments for about ten days, consisting principally of the administration of tranquilizing drugs, but he showed a very minimal response to that treatment. His treating physicians, Dr. Kent and Dr. Kirkpatrick, thereupon jointly decided that electroconvulsive therapy (ECT), or shock treatments, should be administered to Pettis.
A total of four ECT or shock treatments were administered to plaintiff. The first such treatment was administered to him on Friday, May 21, 1971. The second was given on May 24. The third was given on May 26, and the last electroshock treatment was administered to plaintiff on May 28, 1971.
Records or "notes" were kept for each patient by nurses or attendants at Central Louisiana State Hospital, purporting to show relevant facts as to his condition, including the treatment given to and the complaints made by the patient. These hospital records or nurse's notes relating to Pettis show that on May 25, shortly after the second electroshock treatment was given, Pettis was "complaining about back and shoulder hurting." Two additional shock treatments were administered after that notation was made, one on May 26 and the other on May 28. A note on his chart made on May 27 indicates that he was confused and did not know where he was. The hospital records show that on May 28, immediately after the fourth shock treatment was given, Pettis was very slow in his movements, he was confused and he was "complaining of back, lumbar and dorsal of spine."
On May 29, entries made by nurses or attendants showed that Pettis was "complaining of pain in arms and legs." On May 30, they noted that he "appears completely helpless, can't move arms or legs. . . complaining of pain in arms and legs." On May 31, the chart shows that he was "still complaining of pain in legs and back." On June 1, it was noted that he "still complains with hurting all over." A notation on June 2 states that plaintiff remains in bed and will not make an effort to walk. And, on June 3 an entry on the nurse's notes shows that Pettis "has old bruise of right shoulderdown arm to elbowshoulder swollen and tender to touch. May have fracture."
Dr. Kent examined plaintiff on Friday, May 28, after the fourth shock treatment was administered. He ordered that x-rays be made of plaintiff's back and that the giving of further shock treatments be discontinued.
X-rays of plaintiff's back were made on May 28, as directed, but Dr. Kent did not receive the report of those x-rays until the following Monday, May 31. The report revealed that plaintiff had fractures of the bodies of three thoracic vertebrae, T-6, T-7 and T-8. Dr. Kent examined Pettis on Tuesday, June 1, having been advised by that time of the fractured vertebrae and of plaintiff's repeated complaints of pain in his arms and legs. The examination consisted principally of the manipulation of plaintiff's legs and thighs. No further x-rays were ordered at that time, and Dr. Kent did not see plaintiff again, except for one brief period, although he examined his chart on June 3 and 4. The chart showed that Pettis' abdomen was swollen and distended on June 4, so Dr. Bozeman, a general practitioner, was called to examine him. Dr. Bozeman ordered that Pettis be transferred to the Medical Surgical Unit of the hospital, and that transfer was made on June 4.
An x-ray examination was made of plaintiff's shoulders on June 4, after he was transferred to the Medical Surgical Unit, and those x-rays revealed that plaintiff *526 had a fracture of the surgical neck of the left humerus and also a comminuted impacted fracture of the surgical neck of the right humerus. The x-ray report reads:

"LEFT SHOULDER: Examination of the left shoulder reveals the presence of a fracture involving the surgical neck of the humerus with moderate various deformity. There is evidence of healing.

"RIGHT SHOULDER: Examination of the right shoulder reveals the presence of a comminuted impacted fracture of the surgical neck of the humerus. Again there is evidence of healing. These fractures appear to be approximately 3 to 4 weeks old."
An x-ray examination of plaintiff's pelvis, ordered by the Medical Surgical Unit, was made on June 7, 1971, and it revealed that plaintiff had fractures involving both femoral necks. The x-ray report reads:

"PELVIS: Examination of the pelvis reveals fractures involving both femoral necks with marked various deformity bilaterally. These fractures appear to have occurred at approximately the same time as those involving the shoulders. It appears that the patient has been walking since the fractures occurred."
Pettis was transferred to the Huey P. Long Charity Hospital on June 7, 1971, where surgery was performed on both of his hips. He contends that he has never recovered from these fractures and that he is totally disabled as a result of the accident.
The above shock treatments were administered to Pettis without the use of any pre medication, except atropine. The medical evidence is uniform to the effect that fractures frequently are sustained by patients where shock treatments are performed without first administering a tranquilizer or paralyzing drug, such as "Anectine." The experts estimated that from two to 30 percent of the patients who are given shock treatments without the use of a paralyzing drug sustain fractures. Usually the fractures relate to the vertebrae, but occasionally other bones of the body are fractured, such as the shoulders, arms and hips. It is very rare for fractures of the femur to result from those treatments.
Dr. Arthur L. Seale, superintendent of Central Louisiana State Hospital, and Drs. Kirkpatrick and Kent, testified that the nurses and attendants keep a chart on each patient, but that the doctors do not have time to read that chart before each shock treatment is administered. For that reason, it is and has been a custom in that hospital for the Chief Nurse on the morning shift to compile a "24 hour report" on each patient, which she submits to the clinical director at about 8:00 o'clock every morning. In that 24 hour report, the nurse lists the unusual things which happened to the patient during the preceding 24 hour period, which she feels should be called to the attention of the doctor. All agree that the nurses are trained to know the information which should be included in the 24 hour report, and the information which should be called to the attention of the doctors. They also agree that it is important that the attending or treating physician be advised promptly of any complaint of pain made by a patient who receives shock treatments, because of the danger of fractures.
Dr. Kirkpatrick administered all of the above shock treatments to plaintiff. He did not examine Pettis at any time, however, and he has no independent recollection of having ever seen plaintiff or of having administered the treatments to him. He stated that it was not his responsibility to examine the patients, but that it was the responsibility of the attending physician, Dr. Kent, to do so. He testified, however, that "He (Pettis) wasn't my patient, but I am the director of the unit and I am responsible for the patients on the unit, actually." He knew that Dr. Kent had examined plaintiff before the first shock *527 treatment was administered, and he indicated that Dr. Kent was under no duty to examine the patient between such treatments unless he learned that the patient had complained of pain after a treatment was given.
Dr. Kirkpatick testified that he did not know that plaintiff had complained of pain prior to the morning of May 26. He stated that if he had known of those complaints he would have examined plaintiff before administering the third shock treatment on that day, that he probably would have x-rayed him, and that he would have postponed the giving of another such treatment until plaintiff's condition could be determined. He testified that he determines the kind of complaints which are made by patients, "by questioning them and reviewing the history that was taken on admissions unit and by observation and by questioning the attendants and the nurses that had contacts with them." He also stated:
"Our attendants and supervisors and nurses are instructed to question these patients after electric shock therapy to see if they have any complaints. If they have any complaints, they report them to us and then we examine the patient."
* * * * * *
". . . we rely very heavily on the (24) hour report."
Dr. Kent examined plaintiff on several occasions before the first shock treatment was administered. He, in fact, examined him on May 20, the day before the first treatment. He did not examine plaintiff again until May 28, however, after the fourth and last such treatment had been given. Dr. Kent testified that he did not know that plaintiff had made any complaints of pain prior to May 28, and that he learned about it for the first time on May 28 when an "attendant" told him that plaintiff was suffering pain after the fourth shock treatment had been administered that morning. He stated that he depended on the nurses to inform him about any complaints made by the patient, that he received no such information until after the fourth treatment was administered. We assume from his testimony that he did not look at plaintiff's chart or the "nurse's notes" prior to May 28, and that plaintiff's complaints were not noted in any of the 24 hour reports submitted prior to that date. He concedes, however, that "certainly, to some extent," the nurses are under his supervision.
Dr. Kent's testimony, as we understand it, was that he examined the "24 hour report," made by the Chief Nurse for May 25 relating to Pettis, before the third shock treatment was given on May 26, and that there was nothing in that report which indicated that Pettis had complained of pain in the above mentioned areas. He stated that if such a notation had been made, he would have examined plaintiff immediately and would have suspended any further shock treatments until his condition had been determined. Since nothing was said in the 24 hour report about complaints of pain, he assumed that no such complaints had been made.
The record contains the "nurse's notes" or the chart kept for Pettis while he was in the hospital. As we have already observed, these notes contain a statement that plaintiff complained of pain in his back and shoulder on May 25. The record does not contain a copy of the "24 hour report" made by the nurses covering that day, or any other day. Neither the Chief Nurse on that shift, nor anyone else, was called to explain why the 24 hour report was not introduced in evidence. No one contradicted the statement of Dr. Kent that the 24 hour report submitted immediately prior to the May 26 shock treatment failed to show that plaintiff had complained of pain the previous day.
Pettis did not have any bone fractures before the first shock treatment was administered to him on May 21, 1971. He had several fractures after the last such treatment was administered on May 28.
*528 We find that all of the above fractures were sustained by him as the result of the shock treatments which were administered at the Central Louisiana State Hospital.
Plaintiff contends, first, that the defendant doctors were negligent in not administering a muscle relaxant or a muscle paralyzing drug, such as Anectine, to Pettis before performing each shock treatment. He argues that these treating physicians thus failed to exercise the degree of skill ordinarily employed by members of their profession in the same community or locality, and that they failed to use reasonable care and diligence, along with their best judgment, in the application of their skills to the case.
The applicable law was stated by our Supreme Court in Meyer v. St. Paul-Mercury Indemnity Co. of St. Paul, Minn., et al, 225 La. 618, 73 So.2d 781 (1953), as follows:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case."
The burden of proof rests on the plaintiff in a malpractice suit to establish that the defendant physician deviated from the required standard of skill and care. DeLaune v. Davis, 316 So.2d 7 (La.App.1 Cir. 1975).
Eight doctors testified in this case, including the three doctors who are defendants. Seven of them expressed opinions as to whether it is good or accepted medical practice for a physician to administer a shock treatment without the use of a muscle relaxant or muscle paralyzing drug, such as Anectine. Some of them preferred to use that type drug in administering shock treatments, while others preferred not to use it. All recognized the fact that there is a greater danger of the patient sustaining fractures if the drug is not used, but that there is a slightly greater danger of loss of the patient's life, due to respiratory failure or cardiac arrest, if the drug is used. All of the medical experts seem to agree, however, that either procedure is acceptable to members of the medical profession in good standing in that community, and that the doctor who administers that treatment may, consistent with good medical practice, use his best judgment as to whether to use the tranquilizer or muscle paralyzing drug, or not to use it, in any case.
We find no negligence on the part of Dr. Kirkpatrick or Dr. Kent in failing to use Anectine, or a similar drug, in performing shock treatments on plaintiff. See also Chapman v. Argonaut-Southwest Insurance Co., 290 So.2d 779 (La.App. 1 Cir. 1974).
Plaintiff contends next that the defendant doctors were negligent in failing to examine plaintiff after each electric shock treatment was administered to determine whether he was in good physical condition before giving another such treatment. They argue, particularly, that Doctors Kirkpatrick and Kent were negligent in failing to determine whether plaintiff had sustained an injury to his back or shoulder prior to administering the third shock treatment on May 26.
We understand the statements of Dr. Kirkpatrick and Dr. Kent to be that both of those physicians examined the 24 hour report (covering May 25) before the third shock treatment was administered on May 26, but that there was no notation on that report of the fact that plaintiff had complained of pain in his back and shoulder on May 25. Dr. Kirkpatrick indicated that he usually questions the patient, and the attendants *529 and nurses who had contact with him, about complaints made by the patient before administering another such treatment. There is nothing in the record, however, showing that he questioned plaintiff or the attendants or the nurses before giving the third shock treatment on May 26. We assume that he either didn't question plaintiff that morning or that plaintiff did not tell him of those complaints when he was questioned. The evidence indicated that plaintiff was inclined to complain frequently. We think it is more probable than not that Dr. Kirkpatrick neglected to question plaintiff about his complaints on the morning of May 26, but instead that he, like Dr. Kent, relied on the 24 hour report which was prepared by the Chief Nurse. It also seems likely to us that if he had questioned the attendants or nurses he would have learned about the previous complaints made by plaintiff.
The question presented, therefore, is whether the treating physicians, Dr. Kirkpatrick and Dr. Kent, were justified in relying solely on the 24 hour report submitted by the Chief Nurse, which contained no mention of complaints made by plaintiff on the previous day, in concluding that plaintiff had not complained of pain prior to the administration of the third shock treatment.
In Favalora v. Aetna Casualty and Surety Co., 144 So.2d 544 (La.App. 1 Cir. 1962), the plaintiff's hospital admission sheet showed that she had had an episode of "passing out," but the hospital attendants failed to place that information on plaintiff's admission sheet prior to the accident. The defendant radiologist neglected to question plaintiff about her history of having had fainting spells. He proceeded to give her an x-ray examination without obtaining that history from her, and in the course of that examination plaintiff fainted and sustained an injury. The Court of Appeal, First Circuit, held that the radiologist was negligent in having failed to secure plaintiff's medical history prior to commencing the examination. The court said:
"In the case at bar we believe the failure of the radiologist to secure plaintiff's medical history prior to commencing the examinations was negligence constituting a proximate cause of the accident. Had such a history been taken it would (or should) have disclosed that one of the purposes of the examinations was to determine, if possible, the reason why plaintiff was subject to fainting. We have little doubt but that the disclosure of such information would have prompted an increased alertness on the part of the radiologist and technician involved herein."
* * * * * *
". . . The negligence of Dr. Boyer, therefore, consisted not in his lack of skill or competence but in his failure to exercise due care by neglecting to remain sufficiently alert to a reasonably foreseeable expectancy the occurrence of which was calculated to cause injury to plaintiff."
The court concluded in Favalora that the technicians and employees of the hospital also were negligent, holding that "had the floor nurse secured a clinical history of plaintiff and entered it on the space reserved on the requisition slip for this specific purpose, the radiologist would have been alerted to the peculiar circumstances surrounding plaintiff's admission for diagnostic purposes." The court noted that the hospital technicians were highly trained in that particular field, but that that did not relieve the doctor from liability on the ground that those technicians had failed to alert him to the danger.
We think the rule applied in Favalora is applicable here. Despite the negligence of the nurses and attendants of the hospital in failing to inform the doctors of plaintiff's complaints, we believe that Dr. Kirkpatrick and Dr. Kent had the duty of determining whether plaintiff had experienced *530 pain as a result of the shock treatments, thus indicating the possibility of a fracture, prior to administering another such treatment on the morning of May 26. We do not believe that the failure of the 24 hour report to contain a notation to that effect is sufficient to relieve, the doctor of the duty of determining whether plaintiff actually had suffered some symptoms of a fracture before subjecting him to another treatment.
Dr. Kirkpatrick stated that he customarily determines whether a patient has complained of pain by questioning the patient and the nurses and attendants before he performs a shock treatment. In this instance, it is apparent that plaintiff could have been questioned immediately prior to the administration of such a treatment on the morning of May 26 and we conclude that the doctor neglected to do so. We know of no reason why the Chief Nurse, who went off duty at 8:00 o'clock on the morning of May 26, could not have been questioned, since the evidence indicates that the doctor began administering shock treatments at 7:30 each morning, and that the report of the nurse is submitted at 8:00.
Although the doctors testified that they did not have time to read the nurse's notes relating to plaintiff before administering the third shock treatment, we note that the entries made on plaintiff's chart showing the events which occurred on the preceding day, May 25, constitute a total of three lines on that chart. It would have required only a moment for the doctors to have read the two short entries made on that chart after the last shock treatment was administered, and if that had been done, they would have known that plaintiff had complained about "back and shoulder hurting" on May 25.
We think Dr. Kirkpatrick and Dr. Kent failed to exercise reasonable care in proceeding to administer a shock treatment to plaintiff on May 26, without first determining whether plaintiff had sustained a fracture as a result of a similar treatment given just two days prior thereto. Their negligence did not involve an error of judgment or lack of skill, but rather it consisted of the failure to exercise reasonable care and diligence in the application to the patient of the degree of skill which each of those doctors possessed.
Defendants contend, however, that there is no evidence in the record which establishes when the fractures occurred. They concede that there is some evidence to indicate that the compression fractures of the back may have occurred after the second shock treatment, but they argue that there also is evidence indicating that those fractures could have occurred after the fourth shock treatment. They take the position that these are questions of fact for the jury to determine, and that the verdict of the jury should not be upset if there is evidence to support it. We are unable to agree with this argument.
The evidence establishes that prior to the first shock treatment plaintiff had no fractures of the vertebrae or shoulder. After the second shock treatment, he complained of pain in his back and shoulder. Three days later, after the fourth shock treatment, x-rays revealed that he had fractures of the bodies of three thoracic vertebrae, a fracture of the neck of the left humerus, and a comminuted impacted fracture of the neck of the right humerus, as well as fractures of both legs. The preponderance of the evidence is that his complaints of pain made on May 25, after the second shock treatment, were due to fractures of his vertebrae and of the neck of at least one humerus.
We conclude that some of the fractures occurred as a result of the second shock treatment given on May 24. If the doctors had exercised reasonable care, we think they would have determined that plaintiff was suffering from those fractures before the shock treatment was given on May 26, that further shock treatments *531 would have been suspended, and that additional injury to plaintiff would have been avoided.
Defendants contend further that even if these fractures occurred after the second shock treatment, there is no showing that they were aggravated by subsequent treatments. It is argued that the failure to examine Pettis after each shock treatment did not in any way contribute to his subsequent condition.
The evidence shows that plaintiff did not complain of pain in his legs until after the fourth shock treatment was administered. This indicates that the fractures of both legs occurred as a result of the fourth such treatment. The evidence also shows that the injury to plaintiff's right shoulder was a "comminuted impacted fracture" of the neck of the humerus. Dr. Seale explains that "a comminuted fracture is one with multiple fragments, and the impacted means that they are pushed together." The nurse's notes show that on May 25 plaintiff was complaining about his back and shoulder "hurting," but after May 28 those notes show that plaintiff was "completely helpless" and that he couldn't move his arms or legs. His injuries thus were substantially more severe and more disabling after the fourth shock treatment than they were after the second such treatment. While we have no way of knowing the extent of the damage done as a result of the second treatment, we conclude that his condition was greatly aggravated by the administration of the last two shock treatments.
Our ultimate conclusion is that Dr. Kirkpatrick and Dr. Kent were negligent in failing to exercise reasonable care in determining plaintiff's condition before administering the third and fourth shock treatments, and that their negligence in that respect was a proximate cause of the disabling injuries which Pettis has sustained. Green v. State, Southwest Louisiana Charity Hospital, 309 So.2d 706 (La.App. 3 Cir. 1975); Helms v. St. Paul Fire & Marine Insurance Co., 289 So.2d 288 (La.App. 3 Cir. 1974); Bertrand v. Aetna Casualty & Surety Company, 306 So.2d 343 (La.App. 3 Cir. 1975); Lemoine v. Bunkie General Hospital, 326 So.2d 618 (La.App. 3 Cir. 1976); Bryant v. St. Paul Fire and Marine Insurance Company, 272 So.2d 448 (La. App. 2 Cir. 1973).
Dr. Seale was the superintendent of the hospital. The evidence shows that he did not examine or treat plaintiff, he did not authorize or perform the shock treatments and he had nothing to do with the decision made by Dr. Kirkpatrick and Dr. Kent to administer such treatments on May 26 and May 28. There is no error in the judgment of the trial court dismissing the suit as to Dr. Seale, and that part of the judgment appealed from will be affirmed.
The next question presented is whether the nurses, attendants or employees of the Central Louisiana State Hospital were negligent, with the result that the State is liable in damages to plaintiff.
The duty owed by a hospital to its patient is to exercise the degree of care, skill and diligence used by hospitals generally in that community, Lanro v. The Travelers Insurance Company, 261 So.2d 261 (La.App. 4 Cir. 1972); Killgore v. Argonaut-Southwest Insurance Co., 216 So.2d 108 (La.App. 2 Cir. 1968); Garrison v. Hotel Dieu, 319 So.2d 557 (La.App. 4 Cir. 1975).
A hospital must exercise reasonable care toward a patient, as the patient's known condition may require. The hospital is liable for damages sustained by a patient as the result of the failure of the nurses, attendants or employees of the hospital to exercise ordinary care, whether the failure to exercise such care is due to incompetence or non-performance of duty. Meynier v. De Paul Hospital, 218 So.2d 98 (La.App. 4 Cir. 1969); Clarke v. The Gowen Sanatorium, Inc., 160 So.2d 426 (La.App. 2 Cir. 1964).
*532 Where a physician is the employee of a hospital sued by a patient for particular injuries negligently inflicted during the course of the patient's treatment, the hospital may be held liable for the injuries sustained by the patient under the doctrine of respondeat superior. Green v. State, Southwest Louisiana Charity Hospital, supra; Favalora v. Aetna Casualty and Surety Co., supra.
In the instant suit we think the nurses, attendants and employees of Central Louisiana State Hospital were negligent in having failed to include on the "24 hour report" a notation to the effect that plaintiff had complained of pain in his back and shoulder on May 25. The doctors testified that they relied on that report, and that if it had contained an entry showing that plaintiff had made such a complaint, they would have examined him before administering a shock treatment on May 26. The evidence convinces us that plaintiff's injuries would be much less severe if such an examination had been made. The negligence of the nurses or employees of the hospital also constituted a proximate cause of the accident.
Central Louisiana State Hospital is under the administration and management of the Louisiana Health and Human Resources Administration. LSA-R.S. 46:1751. The State thus is liable in solido with the treating physicians for the damages which were sustained by plaintiff as a result of the negligence of the employees of the hospital.
Since we have found that some of the defendants are liable to plaintiff on other grounds, it is unnecessary for us to consider the latter's claim that defendants are also liable for administering shock treatments to plaintiff without his consent.
The State does not mention in its brief the answer it filed to the appeal or its third-party demand against Dr. Kent and Dr. Kirkpatrick. We assume that it has abandoned that demand.
We turn now to the question of quantum.
Plaintiff was 40 years of age when the above shock treatments were administered to him. He was a ward of the State at that time. He has never held a paying job, and there is nothing in the evidence to indicate that he would ever have been able to hold such a job even if the accident had not occurred. The evidence thus fails to show that he has sustained a loss of wages, past or future, as a result of that accident.
All of plaintiff's medical expenses have been provided or paid for by the State. He is now living in a nursing home at a cost of $441.00 per month, all of which costs have been and are now being paid by the State of Louisiana. He also receives a check from the Federal Government each month which is sufficient to take care of his drug bill and other incidental needs. Plaintiff is treated regularly by Dr. J. E. Booth, and all of Dr. Booth's charges are paid by the State. Plaintiff thus has sustained no special damages of any kind.
Surgery was performed on plaintiff's hip on two occasions, in 1971 and in early 1972. He complains of pain now in his legs and of some limitation of motion in his arms. Plaintiff was admitted to the nursing home in October, 1971, with a diagnosis of "Psychoses (Mental Illness) Schizophrenic Bilateral Moore Prothesis." Dr. Booth, his treating physician since 1972, testified that Pettis is crippled as a result of the accident, that he usually walks with a walker or a cane, but that he can walk without that assistance, although he walks with a "duck waddle type of walk." He stated that plaintiff has some difficulty in getting up from a sitting position because of the deformity in his hips. The doctor feels that plaintiff has hit a plateau mentally and physically, that he will not improve very much, and that largely because of his mental condition he will require mostly custodial care in the nursing home. He stated, however, that were it not for plaintiff's schizophrenia and his complete lack of motivation, he *533 would be physically able to do many things of a gainful nature, especially if they could be performed while he is in a sitting position. With reference to the pain of which plaintiff complains, Dr. Booth said, "with his hips like they are, they could possibly hurt him some time . . . but it wasn't anything severe or out of the ordinary."
After considering all of the evidence, we have concluded that an award of $35,000.00 would be fair and adequate for plaintiff's injuries.
For the reasons herein set out, the judgment appealed from is affirmed insofar as it rejects plaintiff's demands against defendant, Dr. Arthur L. Seale, and dismissing the suit as to that defendant. The judgment appealed from is reversed insofar as it dismisses the suit as to all other defendants, and judgment is hereby rendered in favor of plaintiff, Cecil Pettis, and against defendants (1) State of Louisiana, through the Louisiana Health and Human Resources Administration; (2) Dr. William L. Kirkpatrick; (3) Dr. Earl H. Kent, and (4) Tri-State Insurance Company, in solido, for the full sum of $35,000.00, with legal interest thereon from date of judicial demand until paid, and for all costs of this suit. The costs of this appeal are assessed to defendants-appellees, State of Louisiana, Dr. Kirkpatrick, Dr. Kent and Tri-State Insurance Company, in equal proportions, except that the State of Louisiana is relieved of the payment of any costs which they are not legally obligated to pay.
AFFIRMED IN PART; REVERSED IN PART and RENDERED.

ON REHEARING
GUIDRY, Judge.
We granted a rehearing in this case on application of the State of Louisiana, through the Louisiana Health and Human Resources Administration (Successor to State Department of Hospitals and Central Louisiana State Hospital), hereinafter referred to as the State, to reconsider our decision dismissing applicants third party demand for indemnification against Drs. Earl H. Kent and William L. Kirkpatrick.
On original hearing we determined that the State had abandoned its previously filed third party demand against Drs. Kent and Kirkpatrick because it made no mention of same in brief to this court.
Although no mention of such demand appears in the State's brief filed with this court the record reflects that the State filed an answer to plaintiff's appeal and prayed that the trial court judgment be affirmed or, in the alternative, that should the decision be reversed and this court hold that there was negligence on the part of Drs. Kent and Kirkpatrick, then and in that event, the State's third party demand be recognized and the State be indemnified by third party defendants.
Rule VII, Section 5(b), Uniform RulesCourt of Appeal, provides that an appellate court may consider abandoned and dismiss the appeal in any case in which the appellant has neither appeared nor filed brief prior to the time the case is called for argument. In the instant case the State filed its brief and appeared in open court and orally argued this matter. Able counsel for the State urges in brief that at the close of his oral argument he re-urged the State's third party demand. Although we have no specific recollection of this fact we do not now question that he did so. On reconsideration we now conclude that the State's third party demand is viable and that we erred in considering it abandoned.
On original hearing we determined that Drs. Kent and Kirkpatrick were negligent and that their negligence was a proximate cause of the disabling injuries which plaintiff sustained. We held further that Central Louisiana State Hospital was responsible for the negligence of these employees under the doctrine of respondeat superior and that since that hospital was under *534 the administration and management of the Louisiana Health and Human Resources Administration, the State was liable to plaintiff. Considering these conclusions, which we do not disturb, it necessarily follows that the State is entitled to judgment over against Drs. Kent and Kirkpatrick for the amount awarded to plaintiff. It appears to be now well settled that where the master's liability is founded solely on the doctrine of respondeat superior, he is entitled to reimbursement from his servant, the one primarily responsible, in the event he is required to pay damages as a result of the servant's negligence. Williams v. Marionneaux, 240 La. 713, 124 So.2d 919 (1960); Caldwell v. Montgomery Ward & Company Inc., 271 So.2d 363 (La.App.2nd Cir. 1972); 34 L.L.R. 79.
For the above and foregoing reasons our original judgment is reinstated with the following modification to the end that the decree portion thereof shall read as follows:
"For the reasons herein set out, the judgment appealed from is affirmed insofar as it rejects plaintiff's demand against defendant, Dr. Arthur L. Seale, and dismissing the suit as to that defendant. The judgment appealed from is reversed insofar as it dismisses the suit as to all other defendants, and judgment is hereby rendered in favor of plaintiff, Cecil Pettis, and against defendants (1) State of Louisiana, through the Louisiana Health and Human Resources Administration; (2) Dr. William L. Kirkpatrick; (3) Dr. Earl H. Kent, and (4) Tri-State Insurance Company, in solido, for the full sum of $35,000.00, with legal interest thereon from date of judicial demand until paid, and for all costs of this suit. Further judgment is rendered in favor of third party plaintiff, State of Louisiana, through the Louisiana Health and Human Resources Administration and against third party defendants, Drs. Earl H. Kent and William L. Kirkpatrick for the full amount paid by the State of Louisiana in satisfaction of the judgment herein rendered in favor of plaintiff-appellant, Cecil Pettis. The costs of this appeal are assessed to defendants-appellees, State of Louisiana, Dr. Kirkpatrick, Dr. Kent and Tri-State Insurance Company, in equal proportions, except that the State of Louisiana is relieved of the payment of any costs which they are not legally obligated to pay."
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.