361 So.2d 1238 (1978)
Laure Cazes ULMER et al.
v.
BATON ROUGE GENERAL HOSPITAL et al.
No. 12014.
Court of Appeal of Louisiana, First Circuit.
June 12, 1978.
Rehearing Denied August 31, 1978.
*1239 David M. Ellison, Jr., Baton Rouge, of counsel for plaintiff-appellee, Laure Cazes Ulmer, et al.
Robert L. Kleinpeter, Baton Rouge, of counsel for defendant-appellant, Baton Rouge General Hospital, et al.
Before BLANCHE, COVINGTON and CHIASSON, JJ.
COVINGTON, Judge.
Plaintiff, Laure Cazes Ulmer, individually as surviving spouse of George W. Ulmer, Jr., and as provisional tutrix of her minor child, Kristen Lise Ulmer, brought this *1240 wrongful death action to recover damages for loss of support, loss of society and mental anguish. The suit was instituted against Baton Rouge General Hospital and its insurer, Argonaut-Southwest Insurance Company.
Following trial by jury and the response of the jury to interrogatories, verdict was entered for the plaintiff, awarding her, individually, the sum of $200,000.00 and, as tutrix of her minor daughter, also the sum of $200,000.00, or a total of $400,000.00. Judgment on the verdict was signed by the trial judge. Defendants' motion for a new trial was denied. A suspensive appeal has been perfected by the defendants and plaintiff has answered the appeal, asking for an increase in the award to the sum of $600,000.00. We affirm.
A jury verdict should be maintained unless the record reflects that its conclusions of fact are not supported by the evidence, and/or its application of the law is clearly erroneous. Perrin v. St. Paul Fire and Marine Insurance Company, 340 So.2d 421 (La.App. 4 Cir. 1976). In the absence of manifest error, the appellate court is not to disturb, on appeal, the finding of the jury which has evidence before it furnishing a reasonable factual basis for its verdict, based upon its reasonable evaluation of credibility. See Canter v. Koehring Company, 283 So.2d 716 (La.1973).
The pertinent factual events occurred in 1974. Plaintiff alleged that on May 23, her husband, George W. Ulmer, Jr., was admitted as a patient in the Baton Rouge General Hospital. Mr. Ulmer had been admitted to the same hospital previously, following a boat accident on May 11 in which he had sustained rib fractures and internal injuries. On that occasion, he remained as a patient in the hospital until May 17. Complaining of severe chest pains, he was readmitted on May 23; on that date, emergency surgery was performed to repair a tear in the diaphragm and to remove his spleen. Thereafter, he was taken to the surgery ward where he remained until his death on May 26. An autopsy was performed and it was determined that death was caused by massive bilateral pulmonary emboli secondary to thrombosis of the vessels of the lower extremities, with pulmonary infarction of the right lung.
Plaintiff alleged further that during her husband's hospital confinement and as a result of his injuries, the operation and the insertion of tubes and other devices in his body, Mr. Ulmer was unable to get out of bed, walk around or otherwise move about in order to maintain his blood circulation. It was also specifically alleged that despite usual and customary nursing procedures appropriate for post-operative patients in the Baton Rouge area with Mr. Ulmer's history, nurses, employees and other personnel of defendant hospital failed and neglected to periodically change the patient's position in bed or to move him so as to maintain his blood circulation, but rather allowed him to remain immobile in bed for unreasonably long periods of time. It was also alleged in the petition that on the morning of May 26, 1974, the patient's temperature and pulse rate increased drastically; but that, despite these and other signs indicating a serious and deteriorating condition requiring immediate attention of a physician, the defendant hospital's nurses and attendants failed and neglected to call a physician until a substantial period of time had elapsed. Then, the plaintiff, alleging that the aforesaid acts or omissions on the part of the defendant hospital's employees constituted the proximate cause of her husband's death, set out in the petition the alleged negligence on the part of the hospital and itemized the alleged damages. The defendants filed a general denial and affirmatively pleaded that the hospital met the standard of care of hospitals in the Baton Rouge area.
The duty owed by a hospital to its patient is to exercise the degree of care, skill and diligence used by hospitals generally in the community. See Garrison v. Hotel Dieu, 319 So.2d 557 (La.App. 4 Cir. 1975), writ denied, 323 So.2d 129 (La.1975); Killgore v. Argonaut-Southwest Insurance Co., 216 So.2d 108 (La.App. 2 Cir. 1968). A hospital must exercise such reasonable care *1241 toward a patient as the patient's known condition may require. If, as the result of the failure of nurses, attendants or employees of the hospital to exercise reasonable care, whether through incompetence or nonperformance of duty, so as not to measure up to the community standard of care, a patient dies or sustains injuries, the hospital is liable for the damages sustained thereby. Meynier v. DePaul Hospital, 218 So.2d 98 (La.App. 4 Cir. 1969).
From the verdict, it appears that the trial jury accepted the plaintiff's allegations that there were acts of negligence on the part of the defendant hospital after the surgical operation. We do not find manifest error in the verdict and judgment based thereon. On the contrary, there is impressive evidence in the record establishing the liability of the defendant hospital.
Dr. Leo Farmer, a general surgeon, testified as to the events leading up to the demise of Ulmer. As stated above, Ulmer was involved in a boating accident on May 11 and was admitted to the defendant hospital at that time, suffering from rib fractures and associated injuries. Ulmer was ambulatory and seemed to have recovered sufficiently for discharge from the hospital on May 17. Subsequently, Ulmer went back to Dr. Farmer on May 23, at which time the patient was observed to be pale, to have a lowered blood pressure and in shock. Dr. Farmer immediately readmitted Ulmer to the hospital, and on the same day he performed surgery to remove the patient's spleen. As far as could be determined, the operation was successful and the surgeon expected a routine recovery. Dr. Farmer testified as to the duties of nurses required to maintain proper blood circulation of a post-operative patient, as follows:
"Q. . . . In Baton Rouge and at the time of this young man's hospitalization, was it considered the duty of nurses to see that the patient's circulation is maintained after an operation?
A. . . .[I]t's part of the general nursing care, yes.
. . . . . .
Q. I had asked you earlier in your deposition, Doctor, on page 15, `Is it considered within the province of the nurses to see the patient's circulation is maintained post-operatively?' And you said, `Yes,' is that correct?
A. That's correct.
Q. And I also asked you if they do that without any order at all from the doctor?
A. It's usually routine, yes.
. . . . . .
Q. Now, again, where a patient is in pain and won't do it himself, are the nurses to do this themselves, physically?
A. I would believe this would be the standard of nursing care, yes."
Dr. Farmer also testified that a patient should be encouraged to straighten out his legs, because leaving them in a bent position contributes to stasis or cooling of the blood in the lower legs, which would be one of the multiple contributing factors in causing stagnation of the blood and blood clots.
Dr. Farmer examined the autopsy report and stated that it showed the cause of death to be "a massive pulmonary embolus, bilateral pulmonary emboli."
Dr. Carl F. Tucker, pathologist, testified that he performed the autopsy on Ulmer, and determined that the cause of death was "massive blood clots which formed in the lower extremities, the legs, and migrated through the vessels of the body through the right side of the heart, lodged in his pulmonary arteries."
Dr. Tucker also testified to certain procedures, such as the use of a strainer or umbrella, that can be used to prevent blood clots from reaching the lungs or heart. He also stated that he had been able to ascertain from certain lesions, known as pulmonary infarctions, that Ulmer had been throwing off blood clots for several days before the terminal or lethal blood clot occurred.
Dr. Tucker further testified that the symptoms of phlebothrombosis (presence of a clot in a vein) include "fever, elevated temperature, elevated heart rate, pain, *1242 swelling, discoloration, sometimes cyanosis, which is a purplish discoloration; sometimes the leg turns white; so it can turn either pale or purple; and there's several signs you can perform, one is called Homan's sign . . . and that's where you flex the foot backward and if there's pain that develops in the calf or the back part of the knee called the popliteal area, that's a sign that makes you anticipate that a person has phlebothrombosis or thrombophlebitis (inflammation in a vein usually associated with a thrombus)." He specifically stated that the patient's chart did not indicate that any physician had given Ulmer the test for Homan's sign despite the fact that the patient indicated several of the symptoms of phlebothrombosis. It is significant that Dr. Tucker declared Ulmer to be a high risk for blood clots "due to the fact that he had serious trauma and then he also, first admission he was a high risk because of his trauma; the second admission he was a high risk because of his surgery and his trauma; and he had probably been in bed, I guess, for ten days or two weeks at the time he was admitted the second time."
Mrs. Camile Salins, a registered nurse and Director of Nurses at Doctors' Hospital in Baton Rouge, testified that when a patient was unable to move himself because of being sedated or comatose, the nurse physically moves his legs; additionally, the nurse "coughs" and "deep breathes" the patient, in order to exercise his lungs and to get secretions up; if the nurse sees that the patient has put his legs in a bent position, she would straighten them out, in order to promote circulation of the blood. She also testified to certain drastic circumstances under which a nurse would have a duty to call a doctor to attend to a patient, such as when the heart rate increases substantially, temperature rises suddenly and remains high despite routine measures to lower the temperature.
Mrs. Laura Cronin, a registered nurse and Head of Nursing Services at Woman's Hospital in Baton Rouge gave testimony substantially to the same effect as Mrs. Salins.
Mrs. Cronin stated that when a patient, who has had abdominal surgery for the removal of his spleen, is unable to move himself, requires medication to lower a high temperature which fluctuated sharply, suddenly becomes pale, his abdomen is distended and his breathing rapid, the doctor should be called.
Following the physician, pathologist and two nurses as witnesses were nine nurses, either registered or licensed practical nurses, employees of the Baton Rouge General Hospital. The gist of their testimony was that it was standard care to ensure that a post-operative patient moves his legs and is turned frequently, about every two hours and that he coughs and deep breathes. These nurses also corroborated the fact that from the symptoms shown by Ulmer, a physician should have been called.
The hospital records, as testified to by these nurses, reveal that no physician was called for Ulmer from the time that Dr. Baughman saw him on May 25th at about 2:00 P.M. until 7:15 A.M. on May 26th, despite the alarming symptoms.
The plaintiff's final medical witness was Dr. David Aiken, a physician and surgeon, who qualified as an expert on behalf of plaintiff and who testified on direct and on rebuttal. In substance, Dr. Aiken considered that any small blood clots that Ulmer may have had when he was re-admitted to the hospital on May 23 were not of a size to cause death. Further, he indicated that if Ulmer had not been routinely moved and his legs exercised, this immobility could have contributed to enlargement of blood clots and resulted in his death. Dr. Aiken felt, after examining Ulmer's chart, that a physician should have been called. He pointed out that upon being called, any prudent physician would have checked out Ulmer's alarming symptoms and had certain tests for blood clots made.
In opposition to the expert testimony offered by the plaintiff, the defendants offered that of Dr. Paul DeCamp, a surgeon and Chief of Staff of Ochsner Foundation Hospital in New Orleans, the testimony of Dr. Donald Cowick, who was an attending *1243 physician, and of Mrs. Mary B. Hardy, Director of Nursing Service at the defendant hospital. The defense also recalled Dr. Tucker.
Dr. DeCamp had reviewed the records of both hospital admissions of Ulmer, as well as the autopsy report. He was of the opinion that the nurses had followed the doctor's orders in this particular case. He indicated that with reference to moving a patient after a surgical procedure, there is nothing to indicate that such movement does any good. Relative to the possibility of inserting an umbrella into a patient with clots forming, Dr. DeCamp did not recommend such procedure, but that if it is used, the umbrella should be inserted in the patient's neck rather than his leg.
Dr. Cowick testified he visited Ulmer once on each day he was in the hospital and that he checked the patient's chart each time. Concerning the nurses' handling of the patient, Dr. Cowick testified as follows:
"The nursing care of this patient was quite compromised from the standpoint of his severity of illness, the amount of medical monitoring apparatus, the amount of treating apparatus, that had to be attached to this patient, and it's my impression that the nursing care was carried out to the best of their ability in relation to this, however, I do say that the nursing care was compromised from the standpoint that he had a very severe injury. . . . Each of these limit the standards of nursing care somewhat."
The parents of Ulmer testified to some extent about their son's second hospital confinement. They testified that the nurses moved the patient very little.
Laure Cazes Ulmer, the widow, testified to the boating accident and her late husband's admission and re-admission to the hospital. The patient, according to her testimony, was taken to surgery soon after being re-admitted on May 23 and released from the recovery room to his hospital bed at about 7:30 P.M. The wife remained with Ulmer until 9:00 P.M.; later she returned and stayed with him until the next day. When she left on May 24, one of Ulmer's parents remained with him until noon on the following day, Saturday, at which time the wife returned to the hospital. She stayed with her husband until his death. She testified that no nurse moved her husband's legs at any time when she was at the hospital. When questioned about her husband's condition early in the morning of May 26th, starting just about midnight, she stated that at that time he suddenly turned very white and she immediately called a nurse. She said that her husband was last seen by a doctor, prior to the final emergency, on May 25th about noon or 1:00 P.M. After her husband turned pale, he also complained of pain and nausea. Later on in the morning of May 26th, Ulmer called to his wife that he felt bad and began to vomit. His wife called the nurse. Her husband's condition continued to worsen and Mrs. Ulmer was asked to leave the room in order that the nurses and doctors could attend to him. Mr. Ulmer was pronounced dead about 8:10 A.M.
In summary, the testimony of the family was to the effect that they were not instructed about moving or turning the patient and that, except for one time when Ulmer was placed on the side of his bed and his legs dangled over the side on May 25th, he was not moved or turned by the nurses. It was their testimony that the nurses were not cooperative and seemed to think that the family was complaining when they asked that something be done for the patient.
We had previously indicated the amount of the awards made to Laure Cazes Ulmer, surviving spouse of George Ulmer, Jr., and tutrix of the minor child, Kristen Lise, who was born on November 9, 1972. Appellants contend that these awards are excessive and in support thereof rely on several cited cases wherein the courts of this state have granted lower awards under somewhat similar circumstances. On the other hand, as aforesaid, the plaintiff seeks an increase in the awards.
In Miller v. Thomas, 258 La. 285, 246 So.2d 16, 19 (1971), the Supreme Court stated the well-settled principle that in assessing *1244 damages much discretion must be left to the judge or jury, LSA-C.C. art. 1934(3):
"From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the `much discretion' accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity."
In the case of Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), the Supreme Court expressed the way to ascertain whether the jury had abused its discretion in the following language:
"Since the jury does have, under the law, much discretion in fixing damages, the appropriate procedure for testing whether the jury abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury."
The Supreme Court has also set forth the rule of appellate review as it applies to awards of general damages in the case of Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), as follows:
"The appellate review of awards for general damages is limited to determining whether the trial court abused its great discretion. The adequacy or inadequacy of an award should be determined on the basis of the facts and circumstances peculiar to the case under review, having in regard also that the trier of fact has the advantage of seeing the witnesses and evaluating their testimony, including that of residual pain. The awards made in other cases provide no scale of uniformity; there use is limited to serving as an aid to determine, if the present award is greatly disproportionate to similar awards (if truly similar), whether an issue of abuse of discretion may exist in the present case. In any event, an abuse of trial-court discretion must be clearly demonstrated by the record before an appellate court will tamper with an award of general damages."
See also Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
Mrs. Ulmer testified as to the changes brought about in her life, and her daughter's life, by the death of George W. Ulmer, Jr. The family was close-knit and of a sharing nature. He was a member of the Church of Jesus Christ of Latter Day Saints and taught Sunday School. He had been an insurance adjuster, was selling insurance at the time of his death and was doing well in his job. The wife was supported in her testimony by the young man's parents and two family friends.
Dr. George R. Rice, a professor of Economics at Louisiana State University, testified as to the economic loss due to the death of Ulmer. He projected the earnings of the decedent from his present earnings, taking into consideration inflation, salary increases and the work-life expectancy. Dr. Rice used a work-life expectancy of 31½ years, and opined that the economic loss to Mrs. Ulmer and the child amounted to $523,000.00.
We have considered the awards made in the instant case in light of the well-established rule and find no abuse of the much discretion vested in the jury. The awards are within the bounds of the jury's discretion; therefore, they will be neither lowered nor increased by this Court.
The appellants objected to the testimony of witnesses who were not listed on the pre-trial order or furnished in response to interrogatories, and objected to the trial court's denial of a continuance. There is no merit to this objection and the trial court did not abuse its discretion in such denial. The local rules of court, which appellants claim were not adhered to, are intended to aid the orderly conduct of litigation and are not to be construed so literally as to defeat their intended purpose. Caston v. Woman's Hospital Foundation, Inc., 243 So.2d 872 (La.App. 1 Cir. 1971).
The record reflects that counsel for appellants was furnished with the names of *1245 several additional witnesses more than a week prior to trial. No witness, either lay or expert, was of the type which counsel would not expect to be used in a case of this nature. The record supports the conclusion that counsel for appellants ably questioned all witnesses and that appellants were in no way prejudiced. Moreover, even if the objected-to witnesses had not been allowed to testify, there is other ample evidence in the record to support the jury's award.
For the reasons assigned, the judgment appealed from is affirmed at appellants' costs.
AFFIRMED.