319 So.2d 557 (1975)
Jim GARRISON
v.
HOTEL DIEU and Pacific Employers Insurance Company.
No. 6930.
Court of Appeal of Louisiana, Fourth Circuit.
September 9, 1975.
Rehearing Denied October 9, 1975.
Writ Refused November 21, 1975.
*558 Tucker, Schonekas & Garrison, Jim Garrison, New Orleans, in pro per.
Lemle, Kelleher, Kohlmeyer & Matthews, H. Martin Hunley, Jr., New Orleans, for defendants-appellants.
Before SAMUEL, STOULIG and BOUTALL, JJ.
STOULIG, Judge.
Plaintiff, Jim Garrison, was awarded a judgment of $109,400, based upon a jury verdict in this amount, for a back infection he allegedly incurred because hospital personnel negligently "impelled" him to take a shower the day following surgery which allegedly resulted in a staphylococcal infection. Defendants, the Hotel Dieu Hospital and its insurer, Pacific Employers Insurance Company, have appealed suspensively.
We reverse. The record does not sustain either a finding that the hospital staff breached the duty of care it owed plaintiff as an inpatient or that the back infection was in fact caused by the shower.
To establish malpractice, it is necessary for plaintiff to prove one or more Hotel Dieu employees performed in a substandard waywhat is customarily accepted and provided by hospitals throughout the community as competent care of patients having the same known medical condition as plaintiff. It must be shown that the hospital personnel negligently departed from the recognized standard of care afforded by the hospitals in the area for the particular type of illness involved. The measure of skill, care and diligence each hospital employee owes to the patient is that established by other institutions throughout the area as adequate and acceptable medical care the patient's known condition may require.[1] It therefore follows that the plaintiff must first establish the criterion of what constitutes acceptable medical care in hospitals in the Greater *559 New Orleans are so that the alleged act or acts of malpractice may be measured against this norm to determine if there is merit in the plaintiff's malpractice claim.[2] There is no evidence in the record to reflect what hospital care is considered standard and acceptable in the area of nursing care from which plaintiff's complaints emanate.
This omission in itself is sufficient reason for reversal; however, we think it is appropriate to include an analysis of the evidence presented to the jury when the result reached is different from that of the trial court. A jury verdict should be maintained unless the record reflects its conclusions of fact are not supported by the evidence and/or its application of law is clearly erroneous.[3]
The facts as Mr. Garrison states them are as follows: In September 1969, plaintiff was admitted to Hotel Dieu for traction to alleviate complaints of back pain. During this stay he took a shower without assistance when hospital personnel inquired if he had had a bath. After a short stay, he was discharged but it soon became apparent the traction treatment gave only temporary relief. Within the next few months his condition deteriorated; therefore he was re-hospitalized for surgery. On December 18, 1969, Dr. Donald Richardson, a neurosurgeon, removed bilaterally the disc at the L-4 interspace of the lumbar spine. Pre-operative and postoperative narcotic drugs were administered to alleviate the pain, leaving plaintiff in what his physician described as a "confused and disoriented state." [4] At 6 p.m. on December 19, 1969, while still under the influence of drugs, Mr. Garrison, without the knowledge of any hospital personnel and with the assistance of one of the police officers (assigned to Mr. Garrison because he was the Orleans Parish District Attorney), got out of bed and took a shower. Although Officer Lynn Loisel attempted to cover the dressing with a towel as Mr. Garrison showered, it nonetheless became wet. After plaintiff returned to his bed, Loisel advised one of the hospital staff he had taken the shower. The nurse in charge summoned Dr. Richardson, who in turn came to the hospital, checked the patient and told him to take no more showers until he was given permission. Mr. Garrison explained he was driven to this ill-advised action (and this is his theory of what constitutes the malpractice) "* * * so soon after the operation * * * [because] I had repeatedly and repeatedly been asked by different nurses and hospital employees as they came through, had I had my bath yet."
In his condition he claims the oft-repeated inquiries about the bath were construed by him to be harassment to take a shower. He explained the term "bath" did not mean bed bath to him but "shower." He gave two reasons for construing both to mean he was required to shower: (1) His long experience in the Army (5 years) trained him to think bath meant shower; and (2) during his previous stay at Hotel Dieu, it was his custom in response to the inquiry if he had had his bath to take a shower (in this instance of hospitalization no surgery was involved).
On December 24, 1969, plaintiff left without notifying the hospital or complying with its procedures for the release of patients, because, as he put it, it was Christmas Eve. Admittedly, at that time plaintiff *560 had been discharged by Dr. Richardson.[5]
During the next seven months, despite extensive physical therapy treatments at the New Orleans Saints football training camp, the back pain persisted. In mid-July 1970, plaintiff collapsed at his home with severe muscle spasm and obvious excruciating pain. He was taken to Hotel Dieu where a back infection at the L-4 interspacethe site of the December surgery was diagnosed by X ray. Treatment with antibiotics required three months' hospitalization and he apparently suffered back pain for almost a year after his discharge in October 1970.[6] Mr. Garrison claims the July 1970 flareup was diagnosed as a staphylococcal infection (staph infection) that was introduced into his system by bacteria forming on the surgical dressing, dampened in the shower of December 19.
After all the evidence was adduced, the summarized assertions of plaintiff remained unproven allegations. He failed to prove: (1) he was harassed into taking a shower by hospital personnel before it was safe to do so; (2) that in his mind the term "bath" always meant shower; and (3) that the back infection of July 1970 was in any way caused by or related to the shower incident.
The first charge that the nurses and aides had "repeatedly and repeatedly" bothered him about a bath could only have been substantiated by plaintiff and the three police officers who attended him during his hospital stay. The officers, then employed by the City of New Orleans and in no way affiliated with or paid by the hospital, were the only persons he would allow to remain in his room. They divided the 24-hour day into three shifts, Officer Louis Bordelon had the day shift; Officer Lynn Loisel, the afternoon and evening shift; and Sergeant Louis Ivon, the night shift. As Mr. Garrison described it, the inquiries about the bath were incessant. Officer Bordelon could recall hospital personnel asking frequently about a bath on December 19, but when closely questioned as to the exact number of times, he indulged in this hyperbole:
"EXAMINATION BY MR. GARRISON:
Q As near as you can recall, when did these instances, what you described where I was asked if I had taken my bath occur on the 19th, the second day?
A Yeah, the 19th, I take it the day after the operation, on several occasions and I say severalI'd say close to a dozen times, in my mind; different people would walk in and ask you if you had taken your bath yet. And sometimes I was in the room with you, sometimes I wasn't." (Emphasis added.)
Loisel's testimony reflects the same tendency to exaggerate because he intimates the recurrence of the bath question reached "bugging" point and yet he finally conceded that on the afternoon-evening shifts of December 18 and 19 he only heard one inquiry about a bath each day. The third witness, Sergeant Ivon, did testify he heard Mrs. Margaret Cretini, a private duty nurse hired by the Garrison family for the 11 p.m. to 7 a.m. shift of the night of December 18-19, offer to give Mr. Garrison a bed bath at approximately 6 a. m. before she went off duty.
This evidence is corroborated by a note entered by Mrs. Cretini on the nurses chart *561 of the Garrison hospital record and it is this entry that cast doubt on Mr. Garrison's assertion that to him "bath" always meant "shower." The nurse's entry reflects Mr. Garrison declined her offer of a bed bath and said his wife would bathe him later in the day when she came to the hospital.
The third unproven allegation we comment on is the contention the shower incident caused a staph infection. Dr. Richardson, who did diagnose the July 1970 condition as staphylococcal infection, was asked to relate the infection to the shower incident, in this colloquy:
"Q What was your conclusion at the time you diagnosed the infection in July of 1970? What was your conclusion as to the probable cause of that infection?
A I really can't say what caused it with any specificity.
Q Do you connect it or do you disconnect it with your previous concern about the shower?
* * * * * *
THE WITNESS:
Well, I can't disconnect it, but I can't specifically say that that is what caused it."
While Mr. Garrison's medical expert could not say the shower was connected with the infection, defendants' medical experts stated unequivocally the infection was blood borne and had nothing to do with the premature shower after surgery. They were Dr. J. Ralph Meier, a pathologist; Dr. Walter Brent, an orthopedic surgeon who assisted Dr. Richardson in performing the operation on plaintiff; and Dr. John Seabury, a specialist in infection and pulmonary diseases on the staff of Louisiana State University Medical School. Their opinions may be summarized as follows: The infection did not enter the body from the outer skin at the operative site because there was no evidence of redness, swelling or drainage from the wound.[7] The infection rather was blood borne, i.e. it started somewhere else in the body and moved to the spinal column.
We comment at this point that even had Mr. Garrison proven every assertion he made about being harassed into showering prematurely and contracting an infection, we do not think that repeated inquiries by nurses or aides to patients as to whether they have had a bath would constitute malpractice. However, if we assume arguendo it would, we would nonetheless reject this claim because plaintiff failed to prove he was repeatedly harassed and that the shower had any connection whatsoever with the infection.
In the alternative, plaintiff invokes the doctrine of res ipsa loquitur. This is an evidentiary principle the applicability of which may only be determined at the conclusion of the trial.[8] In this case it is not applicable because the facts do not suggest the negligence of the hospital is the more plausible explanation of the infection.[9] The quoted language from Boudreaux v. American Insurance Company[10] clearly excludes this case from the res ipsa loquitur doctrine:
"In this respect, the principle of `res ipsa loquitur' (the thing speaks for itself) sometimes comes into play as a rule of circumstantial evidence, whereby negligence is inferred on the part of a defendant because the facts indicate this to be the more probable cause of injury in the absence of other as-plausible explanation by witnesses found credible. Pilie *562 v. National Food Stores of Louisiana, 245 La. 276, 158 So.2d 162 (1963); Larkin v. State Farm Mutual Auto. Ins. Co., 233 La. 544, 97 So.2d 389 (1957); Malone, Res Ipsa Loquitur and Proof by Inference, 4 La.L.Rev. 70 (1941); Comment, 25 La.L.Rev. 748 (1965). Thus, by this principle where properly applied, the circumstantial evidence indicates that the injury was caused by some negligence on the part of the defendant, without necessarily proving just what negligent act caused the injury.
"We noted in Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389, 391 (1957): "* * * the maxim [res ipsa loquitur] means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference . . . The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence . . . When all the evidence is in, the question is still whether the preponderance is with the plaintiff.'
"Nevertheless, when all the evidence is in and the question is whether, by reason of the res ipsa loquitur rule, the plaintiff has preponderantly proved that the defendant is responsible in tort for his injury, we have in our most recent decision on the issue noted that the real test of applying res ipsa loquitur to be as follows: `Do the facts of the controversy suggest negligence of the defendant, rather than some other factors, as the Most plausible explanation of the accident?' Pilie v. National Food Store, 245 La. 276, 158 So.2d 162, 165 (1963). (Italics ours.) On the other hand, application of the principle is defeated if `an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as one that it was due to his negligence.' 158 So.2d 165 (Italics ours.) See also Comment, 25 La.L.Rev. 748, 764 (1965). This is simply another formulation of the burden of a plaintiff in a tort action to prove that, more probably than not, his injury was caused by the negligence of the defendant." (Emphasis theirs.)
In this case it is more reasonable to conclude the infection plaintiff suffered was blood borne and not introduced externally at the operation site due to some act of negligence of the hospital staff. Prior to this hospitalization, plaintiff suffered respiratory infections. Medical evidence establishes it is possible bacteria from this area traveled through the blood stream to the operative site and caused the infection.
In view of our findings it is unnecessary to pass upon the issue of plaintiff's contributory negligence in taking a shower on the day following major surgery without the knowledge and approval of his treating physician. However, it is interesting to note that Dr. Richardson testified that in all of his experience gained from 1,500 to 2,500 major surgical operations he never had a patient get up the following day and take a shower without his express approval in fact he has never heard of a patient taking a shower on the second day after a bilateral disc operation.
For the reasons assigned the judgment appealed from is reversed. Plaintiff is to pay all costs of this litigation.
Reversed.
BOUTALL, J., concurs with written reasons.
BOUTALL, Judge (concurring).
I concur. I find nothing in the record which establishes a standard of care such that the activities of the hospital personnel, even if determined to be as testified to by plaintiff-appellee on a credibility call, constituted a breach of the duty owed the patient.
NOTES
[1] Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App. 4th Cir. 1972); Killgore v. Argonaut-Southwest Insurance Co., 216 So.2d 108 (La.App. 2d Cir. 1968).
[2] George v. Travelers Insurance Company, 215 F.Supp. 340 (E.D.La.1963).
[3] Mayes v. McKeithen, 213 So.2d 340 (La. App. 1st Cir. 1968); Duray v. Continental Insurance Company, 311 So.2d 491 (La.App. 4th Cir. 1975).
[4] However, under cross-examination Dr. Richardson stated he did not say and did not think that the drugs given to plaintiff on the day following surgery rendered him unable to understand what was going on.
[5] According to Dr. Richardson, at the time the sutures had been removed and the wound had healed well with no physical signs of infection or drainage. Plaintiff was discharged and sent home without a bandage, and no trouble was anticipated beyond normal disabilities. Even upon readmission seven months later, the skin incision at the operative site was well healed with no external evidence of infection or drainage.
[6] Unquestionably plaintiff did suffer agonizing and disabling pain for approximately two years.
[7] This condition of the operative site was corroborated by plaintiff's own treating physician and neurosurgeon, Dr. Donald Richardson (see n. 5).
[8] Day v. National U. S. Radiator Corporation, 241 La. 288, 128 So.2d 660 (1961).
[9] King v. King, 253 La. 270, 217 So.2d 395 (1968).
[10] 262 La. 721, 264 So.2d 621, 636 (1972).