497 So.2d 1066 (1986)
Joseph Keith MARIANO and Kearbie Anne Mariano
v.
Dr. John TANNER and West Jefferson General Hospital.
No. 86-CA-318.
Court of Appeal of Louisiana, Fifth Circuit.
November 10, 1986.
Rehearing Denied December 17, 1986.
Writ Denied February 6, 1987.
*1067 Herbert B. Bowers, III, Poindexter, Bowers & Tinan, New Orleans, for plaintiffs-appellants.
Marianne S. Pensa, C.T. Williams, Jr., Blue, Williams & Buckley, Metairie, George M. Papale, Michael C. Luquet, Stumpf, Dugas, Le Blanc, Papale & Ripp, Gretna, for defendants-appellees.
Before BOWES, GAUDIN and DUFRESNE, JJ.
BOWES, Judge.
The plaintiffs, Joseph Keith Mariano and Kearbie Ann Mariano, filed an action against the defendants, Dr. John Tanner (Mrs. Mariano's obstetrician), West Jefferson General Hospital, Nurse Donna Gray, and their respective insurers, alleging medical malpractice and negligence in connection with the delivery of their baby. At the close of the plaintiffs' case in chief in this non-jury trial, counsel for the defendants moved for a judgment of dismissal based upon the plaintiffs' failure to demonstrate a right to relief. The trial court found the defendants did not breach their standard of care and granted the dismissal. It is from this ruling that the plaintiffs appeal. We affirm.
The testimony at trial established the following facts:
On May 28, 1982, Mrs. Mariano began having labor pains and presented herself at the emergency room of the West Jefferson General Hospital at approximately 8:30 p.m. She was taken to the Obstetrics Unit where a preliminary examination and evaluation were performed by Donna Gray, R.N., head nurse of labor and delivery. A nitrozine test was administered, and results were negative, indicating that the amniotic sac had not yet broken. A vaginal examination revealed that Mrs. Mariano was dilating two to three centimeters, which indicates very early labor (late labor occurs when there is dilation at 10 centimeters). Nurse Gray placed the patient on an external fetal monitor and determined that the fetal heart tones were 137/regular with some deceleration of the fetal heart tone *1068 occurring with her contractions, which were at intervals of five to ten minutes.
It was established at trial that decelerations of the fetal heart tone, when occurring along with contractions, are called "variable decelerations," are not abnormal, and require only that the nurse watch the mother for further signs that might indicate fetal distress. In contrast, such decelerations, when occurring subsequent to contractions, are called "late decelerations" and are a sign of danger to the fetus requiring prompt attention by the doctor.
At approximately 9:30 p.m., Nurse Gray, in accordance with hospital standards, telephoned Dr. Tanner at his residence and told him that Mrs. Mariano had arrived and was in early labor. He was at this time notified of the above findings, except that it is not clear from the testimony whether he was advised of the variable decelerations. His order at this time was "observe, prep., no enema, and give an epidural now." After this conversation, the patient was continually observed and monitored.
Mrs. Mariano underwent no apparent problems until approximately 10:15 p.m. At that time, the patient's husband had just stepped out of the room to call his mother-in-law when the patient noticed for the first time an erratic reading on the fetal monitor graph. She called the nurse on duty, Myla Yap, L.P.N., to advise her of the problem. Apparently Nurse Gray also arrived immediately because she was present in Mrs. Mariano's room at approximately 10:15 p.m. Unable to obtain fetal heart tones, Nurse Gray telephoned Dr. Tanner at approximately 10:20 p.m. and told him that they were having trouble with the monitor. He told Nurse Gray to change the monitor and immediately began preparing to leave for the hospital. The nurses tried a different monitor and still could not obtain a fetal heart tone. At this point, the amniotic sac ruptured, and there was a meconium stain noticed. Ten minutes after the second phone call, at approximately 10:30 p.m., as he was "walking out of the door," Dr. Tanner received a third telephone call from Nurse Gray, notifying him that the membranes had ruptured, a meconium stain had been noted and, even with a different monitor, the nurses were unable to obtain fetal heart tones. Dr. Tanner advised Nurse Gray to prepare the patient for an emergency Caesarean section and that he was on his way.
Dr. Tanner testified that he lives approximately 30 minutes from the hospital. He arrived in the hospital at approximately 11:00 p.m. Upon arrival, Dr. Tanner attempted to obtain fetal heart tones. Unable to do so, he immediately scrubbed for surgery and had the patient taken to the operating room, where a Caesarean section was performed with the assistance of Dr. Bagnetto. The infant was born dead at approximately 11:40 p.m. due to respiratory distress syndrome and acute visceral congestion, and it is for the wrongful death of the infant that the plaintiffs have brought this lawsuit.
It is undisputed that none of the defendants were negligent in their care during surgery and in preparation thereof. The only issues presented by this appeal are:
1. Whether the trial court erred in finding there was no evidence of deviation from the standard of care on the part of each of the defendants in the monitoring of the fetal heart tone during early labor between approximately 9:30 p.m. and 10:20 p.m.; and
2. Whether the trial court erred in granting the defendants' motion for a dismissal at the close of the plaintiffs' case in chief.
The appellants contend that there was negligence on the part of Dr. Tanner, West Jefferson General Hospital and Nurse Donna Gray and that Nurse Gray's negligence is imputable to her employer, the hospital. The appellants submit in brief that Dr. Tanner should have gone to the hospital immediately after receiving the first telephone call at 9:30 p.m. and that, if he had arrived earlier than he did, he could have broken the amniotic sac and placed scalp electrodes on the fetus in order to more accurately monitor the heart tones. Moreover, the appellants contend Dr. Tanner *1069 should have inquired of the nurse at 9:30 p.m. as to whether there were late decelerations reflected on the fetal heart tone monitor graph.
The hospital, according to the appellants, was negligent in not having an alarm bell on the fetal monitor and for not having someone to continuously monitor the readings of the fetal heart tones. The appellants allege the hospital failed to properly train its nurses to read the fetal monitor graph and contend that the graph, which was offered and filed in the record, indicates the fetus was in distress, with late decelerations, prior to 10:20 p.m.
Appellants contend in their brief that Nurse Gray was negligent in improperly placing the "external ultrasound transducer" and in failing to recognize and immediately report late decelerations. The appellants contend that, prior to 10:20 p.m., Nurse Gray should have requested that Dr. Tanner come to the hospital in order to break the amniotic sac and apply scalp electrodes to monitor the fetus' heart tones. Finally, the appellants contend that Nurse Gray was negligent in not responding quickly to plaintiff's first call, which plaintiffs allege in their brief to have been at approximately 10:00 p.m.
In a medical malpractice case, the burden of proof rests with the plaintiff to establish that a health care provider deviated from the required standard of care. Garrison v. Hotel Dieu, 319 So.2d 557 (La.App. 4th Cir.1975); Cable v. Cazayou, 351 So.2d 797 (La.App. 1st Cir.1977); La. R.S. 9:2793(A).
The standard of care owed by a physician is to exercise that degree of knowledge or skill possessed, or the degree of care ordinarily exercised, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skills to the case. La.R.S. 9:2794(A); Myer v. St. Paul-Mercury Indemnity Company, 73 So.2d 781 (La.1953); Lauro v. Travelers Insurance Company, 261 So.2d 261 (La. App. 4th Cir.). A physician is not required to use the highest degree of skill and care possible. Id. He does not guarantee a perfect result, and Louisiana jurisprudence recognizes that despite the best skill and judgment of competent doctors, unfortunate results may occur. Delaneuville v. Bullard, 361 So.2d 918 (La.App. 4th Cir. 1978).
In order to meet the burden of proof in this case, the appellants were required to prove three things:
1. The degree of knowledge or skill possessed, or degree of care ordinarily exercised, by the doctors in Louisiana in the specialty of Obstetrics under similar circumstances;
2. That Dr. Tanner either lacked this degree of knowledge or skill, or failed to use reasonable care and diligence, along with his best judgment, in the application of that skill; and
3. That, as a proximate result, the plaintiffs suffered injuries that would have otherwise not occurred.
La.R.S. 9:2794(A).
A review of the facts and evidence presented at trial reflects that the appellants did not sustain their burden of proof. The plaintiffs' case consisted of the testimony of both plaintiffs and the cross-examination of Dr. Tanner and Nurse Gray. The only other witness to testify for the plaintiffs was Dr. Joseph Pastorek, an obstetrician/gynecologist, who was qualified as an expert and who testified as to his interpretation of the fetal heart tone monitor graph which was offered and filed in evidence at trial.
Appellants' first allegation of negligence against Dr. Tanner is that he "should have gone to the hospital immediately after the first telephone call in order to apply scalp electrodes to the fetus." However, appellants failed to provide any evidence at the trial indicating that Dr. Tanner had any indication of fetal distress until the second telephone call from Nurse Gray at approximately 10:20 p.m. Approximately forty minutes later, the time it took him to prepare *1070 to leave his home and to drive from his residence to the hospital, he arrived at the Obstetrics Unit.
Furthermore, appellants failed to carry the burden of showing the standard of care in this community requiring Dr. Tanner to proceed to the hospital earlier. In fact, the actual standards were established by Dr. Tanner and not appellants' expert, Dr. Pastorek, as was appellants' burden. Dr. Tanner explained to the Court that when a patient in labor arrives at the hospital, a representative of the hospital must call and notify the physician. Absent an emergency, there is no reason or need for the doctor to rush to the hospital while the patient is in early labor. Dr. Tanner was advised by Nurse Gray that the contractions were in intervals of five to ten minutes, indicating normal early labor. The patient would near delivery when the contractions were at intervals of two to four minutes. At that point, that patient is nearing active labor and the doctor should proceed to the hospital. Mrs. Mariano never reached that point in her labor because of the difficulties which arose at approximately 10:20 p.m. and which required an emergency Caesarean section.
Appellants rely on Dr. Pastorek's testimony when they suggest that Dr. Tanner should have proceeded to the hospital earlier to use "scalp electrodes." However, Dr. Pastorek explained that scalp electrodes are used to obtain fetal heart tones after the membranes have been ruptured. There was no testimony or evidence presented demonstrating that Dr. Tanner had reason to believe the membranes were ruptured up until the third telephone call. Prior to that time, Nurse Gray's reporting to Dr. Tanner was that the nitrozine test was negative, indicating that the membranes were intact. Furthermore, there was no evidence produced at trial of any fetal distress or any irregularity to require the doctor to arrive at the hospital during the early labor stage and break the membranes in order to place internal electrodes on the fetus. Nurse Gray did not report that she was unable to obtain fetal heart tones until the second telephone call, at which time Dr. Tanner immediately began preparing to leave his home.
The only reason Dr. Tanner could have had to go to the hospital earlier than he did would have been to perform an emergency Caesarean section in the event there had been a pattern of late decelerations in the early stages of labor. A review of the testimony and the documentation, including Nurse Gray's records, which were regularly kept during Mrs. Mariano's labor and which were offered into evidence at trial, indicates that the plaintiff's decelerations were variable and did not constitute a "pattern of late deceleration."
Both Nurse Gray and Dr. Tanner testified that the fetal heart tone strip, which reflects the monitoring of the fetal heart tone, reflected no sign of late decelerations, and Dr. Tanner testified that upon his arrival at the hospital, at approximately 11:00 p.m., he noted variable, and not late, decelerations. Nurse Gray stated that, upon finding variable decelerations, she began to watch the patient carefully to be sure that there was no indication of fetal distress. Both she and Dr. Tanner testified that only upon the nurse's inability to obtain a heart tone, at approximately 10:20 p.m., was there any reason to believe the fetus was in distress. Thus, there was no alarming news for Nurse Gray to report to Dr. Tanner prior to her telephone call to him at approximately 10:20 p.m.
Only Dr. Pastorek testified that the fetal heart monitor strip indicated that there were late decelerations prior to 10:20 p.m. However, Nurse Gray explained at trial that late decelerations are recognized as occurring persistently and continually subsequent to each contraction. Although there may have been one, or at the most two points, on the strip which could be read as a light drop following a contraction, Nurse Gray was of the firm belief that the observation of the persistent and continuous labor pattern did not suggest that Mrs. Mariano was experiencing late decelerations.
*1071 The medical review panel which reviewed the plaintiffs' claim ruled that the evidence did not support the conclusion that the defendants failed to meet the applicable standards of care as charged in the complaint. The written opinion of the medical review panel was admitted into evidence at trial. While the finding of the medical review panel is not binding upon the trial court, this finding is admissible [see LSA-R.S. 40:1299.47(H)] and corroborates the testimony of Dr. Tanner and Nurse Gray that there were no late decelerations recorded on the heart monitor graph. Moreover, it was established at trial that Nurse Gray had received training from the hospital in reading fetal heart monitor graphs, and her testimony reflects that she understood this process very well.
With regard to Dr. Pastorek's testimony that he had difficulty reading frame number 95371 of the strip because of the poor placement of the "external ultrasound transducer," Nurse Gray testified that the gyrating tracing was due to movement of the baby and the fact that a fetus is active within the amniotic sac, which is an inherent limitation with any monitor attached to the mother. The tracing was expeditiously corrected as indicated by Dr. Pastorek's review of frame number 95373.
While there apparently were some variable decelerations occurring during the early stage of labor, between 9:30 p.m. and 10:20 p.m., the record is entirely devoid of any evidence that variable decelerations warrant immediate emergency care. Even Dr. Pastorek testified that variable decelerations do not constitute cause for alarm. Moreover, the plaintiffs failed to prove the existence of late decelerations. In our opinion, Dr. Pastorek's testimony fell far short of rebutting or overcoming the learned and thorough testimony of Dr. Tanner and Nurse Gray, which was corroborated by the ruling of the medical review panel.
Finally, the plaintiffs simply failed to produce any testimony demonstrating the standard of care in this community, or anywhere, in the monitoring of fetal heart tones and interpreting the significance of variable decelerations. Accordingly, we accept completely and agree with the factual findings of the astute trial judge with respect to the plaintiffs' action against Dr. Tanner.
For the same reasons, we find the plaintiffs' allegations that Nurse Gray should have detected "late decelerations" and should have reported these to Dr. Tanner in her first telephone call to him at 9:30 p.m. to be utterly unsubstantiated.
As for the hospital's alleged negligence, the plaintiffs failed to present any evidence whatsoever of standards of maintenance for the fetal heart tone monitors and of whether such standards were met by the hospital. In addition, no evidence of any dysfunction in the monitor was presented. While appellants allege the hospital was negligent in failing to provide someone to continually monitor the heart tone readings, we find, as the trial court did, to the contrary, that the patient received prompt and continual attention from nursing personnel from the time she arrived at the hospital. By their own testimony, Mr. and Mrs. Mariano admitted that a nurse came to check the monitor as soon as Mrs. Mariano called for help at approximately 10:15 p.m. and that, prior thereto, there had been no discernible cause for alarm. Moreover, Nurse Gray testified that she checked the patient more than once every half hour, as was hospital procedure, and the record reflects that there was at least one other nurse who assisted Nurse Gray in caring for Mrs. Mariano.
In order to establish medical malpractice, a plaintiff must prove, by a preponderance of the evidence, that one or more hospital employees performed in a substandard way ... violating the customarily accepted standard of hospital care ... in failing to exercise the requisite amount of care toward a patient which the particular patient's condition may require. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.App. 4 Cir.1975). Because the plaintiffs failed to prove substandard *1072 care by any of the hospital's employees, we find no negligence on the part of the hospital.
The appropriate standard for the trial court's determination of a motion for judgment of dismissal in non-jury cases is whether the plaintiff has presented sufficient evidence on the case in chief to establish his claim by a preponderance of the evidence. Mott v. Babin, 451 So.2d 632 (La.App. 3d Cir.1984); Poyner v. Cure, 443 So.2d 1151 (La.App. 5th Cir.1983); Thomas v. Thom, 408 So.2d 442 (La.App. 1st Cir. 1981). The procedure is authorized by La. C.C.P. art. 1672(B) [formerly La.C.C.P. art. 1810(B)] which provides:
B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
The "preponderance of the evidence" standard is used in non-jury cases such as this one, as opposed to the standard used for directed verdicts in jury trials of "whether the evidence was such that reasonable and fair-minded men could not have arrived at a verdict in favor of the plaintiff." Allen v. State Through Department of Health and Human Resources, 456 So.2d 679 (La.App. 5th Cir. 1984); La.C.C.P. art. 1672. Accordingly, a judgment of dismissal in non-jury cases should not be reversed absent manifest error. Thomas, supra at 445. The determination of the trial court is entitled to great weight and should only be overturned if it is a clear abuse of discretion. Id.
We are of the opinion that appellants in this case failed to present sufficient evidence during their case in chief to establish their claim against the defendants by a preponderance of the evidence. Accordingly, the learned trial judge's finding that the appellants failed to carry their burden of proving that the defendants were negligent or that their actions were a proximate cause of the death of the fetus, is absolutely correct, and he properly granted the motion for judgment of dismissal.
Lastly, appellants contend that the trial court improperly granted the Motion to Dismiss sua sponte insofar as West Jefferson General Hospital is concerned because their counsel did not move for a dismissal initially. Although only a Motion to Dismiss brought by counsel for Dr. Tanner was before it, the court dismissed all of the defendants. We find no merit to this contention as the record clearly reflects that counsel for the hospital, upon realizing his error, joined in the motion for a dismissal, which the trial court granted.
For the foregoing reasons, we affirm the trial court's dismissal of all defendants. All costs of these proceedings and this appeal are to be borne by the appellants.
AFFIRMED.