506 So.2d 571 (1987)
Dorothy Coleman, Wife of and Larry COLEMAN, Individually and as Administrator, of the Estate of the Minor Child
v.
TOURO INFIRMARY OF NEW ORLEANS, Dr. Ernest Cherrie, Jr., and ABC Insurance Company and XYZ Insurance Company.
No. CA-6794.
Court of Appeal of Louisiana, Fourth Circuit.
April 9, 1987.
Writ Denied June 8, 1987.
*572 Jones Associates, Ltd. Ernest L. Jones, New Orleans, for plaintiffs-appellees.
Thomas, Hayes & Beahn, Harold A. Thomas, Robert D. Ford, New Orleans, for defendants-appellants.
Carruth, Cooper and Adams, Alfred Adams, Baton Rouge, for intervenors-appellants.
Before GULOTTA, BYRNES and LOBRANO, JJ.
GULOTTA, Judge.
In this medical malpractice suit, the defendant hospital and the obstetrician appeal from a $250,000.00 award in favor of a mother for the loss of her prematurely born son. Although we conclude that the evidence is insufficient to support a finding that defendants' negligence caused the death of the child, we hold that the plaintiff mother has proven that the physician's delay in attending her during her labor caused her to endure unnecessary pain, suffering, and mental anguish. Accordingly, we amend the judgment to award the mother the sum of $20,000.00 against the defendant physician only.

BACKGROUND
At 9:30 p.m. on August 31, 1979, Dorothy Coleman, approximately seven months pregnant with her fifth child, began to feel pain and notice vaginal bleeding. According to plaintiff and her husband, the pain worsened and they proceeded to the emergency room of Touro Infirmary after unsuccessfully attempting to telephone Mrs. Coleman's obstetrician, Dr. Ernest Cherrie.
At 1:30 a.m., on September 1, 1979, a duty nurse at Touro telephoned Dr. Cherrie and told him that his patient had been admitted with complaints of pain that Mrs. Coleman said did "not feel like contractions", and some fluid discharge since 4:30 p.m. the previous day. According to the nurse's notes, a "bloody show", a sign of labor, was present, and the nurse was "able to palpate uterine contractions easily", even though no contractions were observed on the fetal monitor. Dr. Cherrie prescribed Demerol to ease Mrs. Coleman's discomfort.
Ten minutes later, the nurse called again to tell Dr. Cherrie that the hospital could not administer the medication since Mrs. Coleman did not have a consent form signed by Dr. Cherrie authorizing the treatment. Dr. Cherrie thereupon requested that Mrs. Coleman be transferred to Hotel Dieu Hospital where she could be given Demerol without the necessity of his coming out to the hospital immediately. Dr. Cherrie felt that if Mrs. Coleman were evaluated at Hotel Dieu and found to be in true labor, he could personally administer to her at that time.
At 2:00 a.m., after being unable to locate Mr. Coleman to have his wife transferred to Hotel Dieu, the nurse telephoned Dr. Daniel Goldman, the Chairman of the Department of Obstetrics and Gynecology at Touro. Dr. Goldman then telephoned Dr. Cherrie and suggested that he come to the hospital. At that time, Mrs. Coleman was two centimeters dilated and was in labor, having contractions every five minutes. At 3:20 a.m. the nurses observed a large amount of "bloody show", indicative of labor.
Dr. Cherrie arrived at the hospital at 3:30 a.m. and, according to his version of the facts, examined Mrs. Coleman at 3:45 a.m. Dr. Cherrie felt Mrs. Coleman was progressing normally in premature labor and he could only wait to deliver the child. He ordered an epidural anesthetic which was administered at approximately 4 a.m.
Upon reexamining Mrs. Coleman at 4:25 a.m., however, Dr. Cherrie noted symptoms indicating a concealed abruptio placenta or tearing of the placenta from the wall of the uterus. Confronted with this complication that endangered the baby as well as the mother, Dr. Cherrie ordered that Mrs. Coleman be taken to the delivery room immediately for delivery.
At 4:29 a.m. Mrs. Coleman gave live birth to a 31 week old son weighing only a few ounces over two pounds. Dr. Cherrie determined that a concealed abruptio placenta had indeed occurred. The child died *573 approximately two minutes later from a lack of oxygen caused by this pulling away of the placenta from the uterus. Although an autopsy was later performed, the placenta was not available for examination.
Mr. and Mrs. Coleman subsequently filed suit against Touro Infirmary and Dr. Cherrie, alleging that the defendants had been negligent by failing to treat the abruptio placenta prior to the premature delivery of the infant and that defendants' actions or inactions had caused his death. After a trial on the merits, the jury rendered a $250,000.00 verdict in favor of Mrs. Coleman and against both defendants, but made no award in favor of Mr. Coleman.

CONTENTIONS
Appealing, Dr. Cherrie and Touro contend that plaintiffs failed to prove that either the physician or hospital lacked the degree of knowledge or skill required or had failed to use reasonable care and diligence in treating Mrs. Coleman. Defendants argue that uncontroverted medical testimony established that the defendant physician and hospital acted correctly and within the standards of care expected under the circumstances. Alternatively, defendants contend that the award is excessive.
The State Commissioner of Insurance, the Attorney General, and the Louisiana Patient's Compensation Fund have intervened on appeal, seeking a reduction in the quantum of the award.
Plaintiffs have moved to supplement the appellate record with a previously filed pleading stating that they intended to file a "cross-appeal" with this court. Plaintiffs argue that the jury erred in denying Mr. Coleman any damages and that the award should be increased to compensate him for the loss of his son.

EVIDENCE
The jury heard the testimony of Dr. Cherrie and two other obstetricians, in addition to the lay testimony of the Colemans and the executive director of Touro Infirmary.
Dr. Cherrie testified that the symptoms of abruptio placenta are extreme elevation of blood pressure and persistent contractions of the uterus. With typical abruptio placenta there will also be heavy vaginal bleeding, but with the concealed form there is no blood coming from the uterus. In Dr. Cherrie's opinion, it was "not highly conceivable" that Mrs. Coleman was in the early stages of abruptio placenta when she first arrived at the hospital since she did not have persistent contractions at that time, and was progressing normally in premature labor. He further testified that when he examined Mrs. Coleman at 3:45 a.m. there was no vaginal bleeding and the nurses notes reflected only a "bloody show", which was an indication that labor was progressing. According to Dr. Cherrie, it was only after the epidural anesthetic was administered at 4 a.m. that Mrs. Coleman suddenly had a sustained contraction, which was the first symptom of the concealed abruptio placenta, a complication that occurs rapidly. He stated that the vaginal delivery which occurred minutes later was much more expedient than a Caesarean section.
Dr. Daniel Goldman, Chairman of the Department of Obstetrics and Gynecology at Touro Infirmary in September, 1979, testified that every doctor handles a situation in his own way and does not necessarily go to the hospital immediately because his patient is in premature labor. Although Dr. Goldman stated that he would have seen this patient sooner than Dr. Cherrie did, he further testified that when Dr. Cherrie came to the hospital Mrs. Coleman was progressing normally and there was no evidence of difficulty from what could be clinically determined by feeling the patient's abdomen and doing a pelvic examination. This physician also stated that pain and bleeding are symptoms of an eruption of the placenta; however, he saw nothing in the hospital records to indicate that Mrs. Coleman was undergoing any abnormality. Considering Mrs. Coleman's regular contractions and the fetal heart tones within the normal limits and suddenly a very short labor at the end, Dr. Goldman would not have been inclined to do a Caesarean section *574 but would have let the premature labor continue just as Dr. Cherrie had done.
A third obstetrician and gynecologist, Dr. Steven Cohen, testified that it is standard care for a physician not to come to the hospital when he is assured there are no specific complications requiring him to be there. Because the record suggested that Mrs. Coleman was having regular uterine contractions and no bleeding, Dr. Cohen felt that nothing suggested any troublesome event. In response to a question whether Dr. Cherrie could have done anything else to save the life of the child in this particular case, Dr. Cohen testified that Dr. Cherrie's obstetric judgment was "excellent".
Barth Winberg, executive director of Touro Infirmary, testified concerning the hospital's policies and procedures in the Department of Obstetrics. He stated that the hospital did not require an obstetrician to be on duty at all times and that nurses were trained to use fetal monitors and to check patients every thirty minutes for contractions, blood pressure, pulse rate, and fetal heart tones. According to Mr. Winberg, private physicians, not registered nurses, examine patients with heavy vaginal bleeding on admission. Although the nurses did contact Dr. Cherrie and Dr. Goldman, no "Code O" or emergency obstetrics call was made for other physicians within Touro to attend to Mrs. Coleman before her personal physician arrived.
Corroborated by her husband, Mrs. Coleman testified that she and her family had unsuccessfully attempted to reach Dr. Cherrie by telephone before going at midnight to the hospital, where Mr. Coleman remained at all times, even though the nurse's notes indicate that Mrs. Coleman was admitted at 1:05 a.m. and that the staff later unsuccessfully attempted to locate Mr. Coleman to transport Mrs. Coleman to Hotel Dieu. Mrs. Coleman stated that she was bleeding and in pain, and that the fetal monitor connected to her was not on for most of the time. According to Mrs. Coleman, an unidentified doctor gave her a shot for pain after she was in the hospital for two or three hours, even though the record does not reflect any such entry. In contrast to the nurse's notes and Dr. Cherrie's testimony, Mrs. Coleman denied that Dr. Cherrie had examined her before delivery.

OBSTETRICIAN'S LIABILITY
A plaintiff in a malpractice action has the burden of proving the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians within the involved medical specialty. The plaintiff must further prove that defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence along with his best judgment in applying it, and that this lack of knowledge or skill or the failure to exercise this degree of care caused plaintiff injuries that would not have otherwise been incurred. LSA-R.S. 9:2794(A); Gurdin v. Dongieux, 468 So.2d 1241 (La.App. 4th Cir.1985), writ denied, 474 So.2d 946 (La.1985); Matranga v. Sara Mayo Hosp., 463 So.2d 632 (La. App. 4th Cir.1984), writ denied, 467 So.2d 540 (La.1985); Wiley v. Karam, 421 So.2d 294 (La.App. 1st Cir.1982).
In determining whether the defendant possessed the requisite degree of knowledge or skill or whether he exercised reasonable care and diligence, the court is guided by expert witnesses who are members of the defendant's profession and who are qualified to testify. Gurdin v. Dongieux, supra; Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981). The views and opinions of the expert witnesses, though not controlling, are very persuasive in this regard. Wiley v. Karam, supra; Guillory v. Buller, supra.
Applying these standards of proof to the instant case, we conclude that plaintiff has failed to prove that any act or omission by Dr. Cherrie resulted in the wrongful death of the Coleman infant. Although the testimony of Dr. Goldman might support a conclusion that Dr. Cherrie could have responded and attended to Mrs. Coleman at the hospital sooner than he did, if only to allay his patient's fears, there is no evidence, considering the expert testimony *575 and the nurse's notes, to support a conclusion that his arriving at the hospital at 3:30 a.m. was causally related to the unfortunate death of the child. There is no showing that had Dr. Cherrie attended to Mrs. Coleman sooner it was more probable that this unfortunate death could have been prevented.
The fetal monitor strip in evidence contains the entry that the monitor was "reconnected 3:20 a.m.... unable to maintain baseline as [patient] moving about" and there was testimony that some of the readings on the strip were subject to varying interpretations. None of the physicians placed any significance on the monitor strip as indicative of a lack of care by either the hospital or Dr. Cherrie, however, and there was no showing that any other monitoring would have permitted an earlier diagnosis of concealed abruptio placenta in this case.
The evidence considered, it is apparent that the Coleman infant died of a sudden complication of concealed abruptio placenta that developed after Dr. Cherrie had arrived at the hospital and that could not have been detected any sooner than shortly before the delivery. Mrs. Coleman's testimony that Dr. Cherrie failed to examine her before delivery is directly contradicted by the contemporaneous notes of the nurse and Dr. Cherrie's testimony. Viewing the evidence in its entirety, we conclude that the jury was clearly wrong in finding that Dr. Cherrie's negligence was a proximate cause of the Coleman baby's death. Mrs. Coleman is not entitled to recover for the death of the child.
The evidence does support, however, the jury's finding that Dr. Cherrie was negligent in his medical treatment of Mrs. Coleman, insofar as his delay in arriving at the hospital caused her needless pain, suffering, and mental anguish. From the time she arrived at the hospital shortly after 1 a.m. until the epidural anesthetic was administered at 4 a.m., Mrs. Coleman endured labor pains without the benefit of any sedative or pain reliever. As reflected by her own testimony and the nurse's notes, her pain was so intense that she was thrashing about in the bed.
Although the medical testimony established that accepted standards of care do not require an obstetrician to go to the hospital immediately upon learning that his patient is in labor, the circumstances of this case were such that Mrs. Coleman was in severe pain and could not be given medication without Dr. Cherrie's written consent. Because of Dr. Cherrie's absence from the hospital during this period of time, Mrs. Coleman suffered needless pain which could have been reduced by the medication. Obviously child birth pain is anticipated; however, the hospital staff was unable to reduce the pain and anxiety suffered by Mrs. Coleman because of Dr. Cherrie's nonattendance. The doctor's recommendation to have the patient transferred to another hospital, for his convenience, added more anxiety to the patient under these circumstances. Although his delay in arriving at the hospital did not cause the infant's death, Dr. Cherrie's tardiness did subject Mrs. Coleman to extraordinary physical pain, suffering, and mental anxiety for over two hours.
We therefore conclude that the jury properly found that Dr. Cherrie was negligent in his medical treatment of Mrs. Coleman. Based on the evidence before us, we conclude that Mrs. Coleman is therefore entitled to damages in the sum of $20,000.00 in consideration of her physical and mental pain and suffering prior to Dr. Cherrie's arrival at the hospital.

HOSPITAL'S LIABILITY
A hospital must exercise the requisite amount of care toward a patient that his or her particular condition may require. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974). The measure of adequate and acceptable medical care owed the patient by each hospital employee is that established by other institutions throughout the area. Matranga v. Sara Mayo Hosp., supra. Garrison v. Hotel Dieu, 319 So.2d 557 (La.App. 4th Cir. 1975), writ denied, 323 So.2d 129 (La.1975). To establish malpractice, a plaintiff must prove by a preponderance of the evidence *576 that one or more hospital employees performed in a substandard way so as to violate this customarily accepted standard of hospital care. Hunt v. Bogalusa Community Medical Center, supra; Mariano v. Tanner, 497 So.2d 1066 (La.App. 5th Cir. 1986).
The evidence considered, we conclude that the jury was clearly wrong in finding Touro Infirmary negligent in its medical treatment of Mrs. Coleman. Although Touro's executive director testified that the hospital did not have an obstetrician on duty at all times and no physician was called in the hospital to attend to Mrs. Coleman, he stated that the nurses were trained to use fetal monitors and to check the mothers in labor every 30 minutes for contractions, blood pressure, pulse rate, and fetal heart tones. The testimony and the nurse's notes establish that the Touro nurses attending to Mrs. Coleman regularly monitored her condition and maintained in close contact with Dr. Cherrie, her personal physician. There was no evidence whatsoever that the hospital violated community standards for care, despite the difficulty in obtaining readings on the fetal monitor and the failure to administer pain medication to Mrs. Coleman before Dr. Cherrie arrived.
Accordingly, we reverse and set aside that portion of the judgment casting Touro Infirmary liable to Mrs. Coleman.

FATHER'S RECOVERY
In a motion to supplement the record in this court, plaintiffs have filed a copy of a "notice of cross-appeal" previously filed in the trial court but missing in the record on appeal. By means of this pleading, plaintiffs seek to have the judgment amended to award Mr. Coleman damages for the loss of his son.
Even assuming, without deciding, that plaintiffs have preserved their right of appellate review on this issue, we find no error in the jury's failure to award any damages to the child's father. Because the evidence fails to support a finding that negligence of the doctor or the hospital caused the death of the child, we conclude that Mr. Coleman is not entitled to an award.

DECREE
Accordingly, we reverse and set aside that portion of the judgment in favor of Dorothy Coleman and against the defendant Touro Infirmary of New Orleans. Judgment is now rendered dismissing plaintiffs' suit against Touro.
We affirm that portion of the judgment in favor of the plaintiff, Dorothy Coleman, and against defendant, Dr. Ernest Cherrie, Jr., individually, but reduce the amount of the award from the sum of $250,000.00 to the sum of $20,000.00, together with legal interest thereon from date of judicial demand until paid and for all costs.
In all other respects, the judgment is affirmed.
REVERSED AND RENDERED IN PART; AMENDED AND AFFIRMED IN PART.