DOUCET, Judge.
This is an appeal from a trial court judgment in favor of the defendants and against the plaintiffs dismissing their claim for damages in a medical malpractice suit.
Jacqueline Godeaux was brought to the Emergency Room at Rayne Branch Hospital (RBH) on January 1, 1984, at about 7:30 a.m. Accompanying her were her daughter, Jeanne Godeaux Wells, and her son, Morris Godeaux. She complained of a sore throat, intermittent swelling of the palate with associated shortness of breath. The Emergency Room record reflects that Mrs. Godeaux had taken Emprin 3. Her complaints were noted on the Emergency Room record by Kathy Fontenot, a licensed practical nurse who was on duty in the Emergency Room at that time. Mrs. Godeaux was then examined by Dr. Jonathan Koeh-ler, a third year resident at Tulane Medical Center who was “moonlighting” in the Emergency Room at RBH on weekends. After examining Mrs. Godeaux, he diagnosed her condition as pharyngitis and ordered an injection of Bicillin and a Stadol-Vistaril combination. Mrs. Godeaux was released from the Emergency Room after paying her bill. Her children took her home and stayed with her. After some time passed, Mrs. Godeaux began gagging. At about 10 a.m., she indicated that she wanted to go back to the Emergency Room. She began struggling for breath. Her daughter called an ambulance. Mrs. Godeaux collapsed and her son began administering CPR. The ambulance arrived and took Mrs. Godeaux away. At the hos *949 pital, resuscitation was attempted without success and Mrs. Godeaux was declared dead. Records show the cause of death as laryngoedema, or swelling of the larynx.
Mrs. Godeaux’s four children made a claim for damages against RBH, Dr. Jonathan Koehler, and Kathy Fontenot. A medical review panel found in favor of the defendants. This suit was filed. After a lengthy trial, the jury returned a verdict in favor of the defendants.
Of the plaintiffs, only Janelle Godeaux Falcone appeals. The appellant raises only one assignment of error. She alleges that the jury committed manifest error in failing to find negligence on the part of.the defendants.
La.R.S. 9:2794 states in pertinent part that:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The Louisiana Supreme Court has further described this burden as follows:
In a medical malpractice action against a physician, the plaintiff carries a twofold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La., 1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Hastings, 498 So.2d at 720.
Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991).
The burden with regard to hospitals and their employees is similar:
A hospital must exercise the requisite amount of care toward a patient that his or her particular condition may require. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974). The measure of adequate and acceptable medical care owed the patient by each hospital employee is that established by other institutions throughout the area. Matranga v. Sara Mayo Hosp., supra [463 So.2d 632 (La.App. 4th Cir.1984)]. Garrison v. Hotel Dieu, 319 So.2d 557 (La.App. 4th Cir.1975), writ denied, 323 So.2d 129 (La.1975). To establish malpractice, a plaintiff must prove by a preponderance of the evidence that one or more hospital employees performed in a substandard way so as to violate this customarily accepted standard of hospital care. Hunt v. Bogalusa Community Medical Center, supra; Mariano v. Tanner, 497 So.2d 1066 (La.App. 5th Cir.1986).
Coleman v. Touro Infirmary of New Orleans, 506 So.2d 571, 575-576 (La.App. 4th *950 Cir.), writ denied, 507 So.2d 1247, 507 So.2d 1248 (La.1987). In this matter, the jury responded in the negative to the following jury interrogatory:
(1) Was there fault or negligence on the part of the following defendants that was the legal cause of Mrs. Godeaux’s death?
Dr. Jonathan Koehler YES NO /
Rayne-Branch Hospital as the employer of Nurse Kathy Fontenot /
If your answer is NO to BOTH defendants, please sign and date the verdict sheet and notify the Court of your decision.
This is a factual finding which may not be disturbed absent manifest error if the evidence furnishes a reasonable factual basis therefor. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
In this case there was conflicting evidence submitted both as to whether the appropriate standard of care was observed and as to causation.
Jeanne Wells, Mrs. Godeaux’s daughter, testified at trial with regard to the care given her mother. She received a telephone call from her mother on January 1, 1984, at 5:30 a.m. Her mother told her in a whisper that she was not well and wanted Jeanne to spend the day. At 6:30 a.m., Jeanne’s brother, Morris Godeaux, called saying that their mother had called him and wanted both children to pick her up at 7:30 a.m. and take her to the Emergency Room. Ms. Wells stated that they met at her mother’s house and went to the hospital. She testified that Mrs. Godeaux was drooling and coughing. She stated that she stayed with her mother throughout. She testified that she gave the history to Kathy Fontenot because her mother was having a hard time talking. She testified that she was not asked about allergies. She stated that her mother couldn’t inhale through her nose, and was crying in pain. Ms. Wells stated that she stayed with her mother through the doctor’s exam, which she states took four minutes at most. Ms. Wells testified that she told the doctor about her mother’s past problems with allergies, asthma, and hoarseness. However, the doctor did not appear to take note of her comments. She testified that her mother gagged when the doctor used a tongue depressor to examine her throat. She testified that the doctor did not use a stethoscope to examine Mrs. Godeaux’s chest and that her mother never even took off her overcoat. She and the doctor went out to where her brother was waiting. The doctor told them he was giving Mrs. Go-deaux two injections and some prescriptions. Ms. Wells testified that neither the doctor nor the nurse gave her mother any instructions before she left. She stated that by the time she had paid the bill for her mother, her mother had become extremely drowsy. The testimony of Morris Godeaux was similar to that of his sister.
However, their testimony at trial was inconsistent with that given in deposition prior to trial. At that time, they described her condition when they took her to the Emergency Room as no worse than it had been when she had sore throats in the past. No mention was made of crying, drooling, gagging, or inability to speak. At that time, both testified that Mrs. Godeaux had gone into the examining room alone with Ms. Wells remaining outside throughout.
Dr. James L. Lowry was qualified as an expert in the field of general surgery and *951 practice. He testified that an inadequate history had been taken and that insufficient diagnostic testing had been done. He testified that Mrs. Godeaux should have been hospitalized and put on IV antibiotics and IV decatron, and that a tracheostomy set up should have been put by her bed. Had this been done, he testified that she would have had a 90-95% probability of survival. He further testified that Vistaril with Stadol was an improper treatment. He testified that Stadol is a respiratory depressant and Vistaril potentiates the Sta-dol increasing its effects by two or three times. Dr. Lowry opined that the nurse should have kept Mrs. Godeaux under observation for 20-30 minutes because of the possibility of an allergic reaction to Bicillin. However, on cross-examination, it was brought out that in a 1988 deposition, Dr. Lowry had stated that, in his opinion, Dr. Koehler had not breached the standard of care or committed malpractice. At the time of the 1988 deposition, he did not have any objection to Dr. Koehler’s choice of medications.
Roberta Glasscock, R.N., testified as an expert in the field of nursing. Ms. Glas-scock opined that Kathy Fontenot’s care of Mrs. Godeaux had breached the applicable standard of care. She felt that the history taken was inconsistent. Further, she stated that Kathy Fontenot should have made an assessment of the patient’s condition, taken a health history, questioned Mrs. Go-deaux as to where and when she had taken the Emprin 3 noted on the Emergency Room record. Additionally, Ms. Glasscock testified that after the doctor’s examination, Mrs. Godeaux’s condition should have been reassessed and that she should have been given instructions as to what to expect and any restrictions to be obeyed. She testified that good nursing practice requires that all patients be monitored after injections are administered.
On the other hand, Kathy Fontenot testified that she had fully assessed Mrs. Go-deaux’s condition. Contrary to the children’s testimony at trial, Ms. Fontenot testified that Mrs. Godeaux was able to speak and gave her own history. She noted no signs of shortness of breath or drooling, and no acute distress. She found Mrs. Godeaux’s vital signs to be normal except that she was running a low-grade temperature. She stated that she observed the patient from the time of injection until she left. She seemed fine. Nothing in her condition indicated an allergic reaction. Further, she did not note the extreme sleepiness which Mrs. Godeaux’s children testified to at trial.
Dr. Koehler testified that he examined Mrs. Godeaux, who was able to speak in response to his questions. She did not appear to be in any respiratory distress and was not drooling. She told him that she had “throat infections” and had been treated with antibiotics. He noted no swelling of the palate. Her nose and ears were clear. She was not audibly wheezing. The tissues at the base of her throat were red but without pus. He used a tongue depressor to examine her throat without a problem. Her neck was tender on the right side without palpable masses. He examined her chest with a stethoscope finding nothing abnormal. He diagnosed her problem as pharyngitis. Pharyngitis is an inflammation of the pharynx which can be due to viral or bacterial infection, chemical irritation or allergy. He asked her if she was allergic to penicillin. She stated that she had taken it in the past without problems. He saw no medical reason to admit her to the hospital at that time. He testified that given the same circumstances, he would do the same again. Dr. Segura, who had treated Mrs. Godeaux previously, stated that he had given her penicillin in the past without problem. He further testified that Mrs. Godeaux was given appropriate treatment in the Emergency Room.
Dr. Carl T. Curtis testified as an expert in the field of family practice and nursing standards. Further, he had treated Mrs. Godeaux. He stated it as his opinion that the treatment given Mrs. Godeaux in the Emergency Room did not breach the standard of care applicable. Each of the three doctors on the medical review panel testified that the care given Mrs. Godeaux was both adequate and appropriate.
*952 Dr. Robert J. Noveck testified as an expert in the field of clinical pharmacology, which studies the effects of drugs in humans. He spent two years in the development of therapeutic agents, one of which was Stadol. He testified that the drugs administered to Mrs. Godeaux by Dr. Koeh-ler were a good combination for the treatment of someone with pharyngitis with upper respiratory infection and bronchitis. He testified that while Stadol depresses or slows down respiration, it does so only to a certain level then stops. Vistaril would not push the respiratory depressive effect beyond this ceiling, but would allow a smaller dose of Stadol to have the effect of a larger one. Further, Vistaril has a bronehodilat-ing effect which is good in patients with asthma. He testified that penicillin reactions usually occur within five minutes of the administration of the drug, but occur within a maximum of twenty minutes.
The cause of Mrs. Godeaux’s death was never determined. Dr. Thomas Graves, an ear, nose and throat specialist, testified that it was no more reasonable to assume that a penicillin reaction caused Mrs. Go-deaux’s death than to assume that an allergy to dust or food on top of a viral infection, caused an airway compromise or heart failure. Dr. Koehler stated that the cause of death could have been anything from an accelerated penicillin reaction to heart attack or pulmonary embolus. He felt that epigtotitus was unlikely because he noted none of the signs in his exam.
The treatment rendered the patient must be analyzed in light of the facts known to the defendant when the patient was treated and not on the basis of hindsight or what is later learned. Lindsey v. Michigan Mutual Liability Co., 156 So.2d 313 (La.App. 4 Cir.1963), writ denied, [245 La. 461] 158 So.2d 612; Ogletree v. Willis-Knighton Memorial Hosp., 530 So.2d 1175 (La.App. 2 Cir.1988). Where it is equally plausible that the injury occurred from another cause as from the defendant’s negligence, liability cannot be imposed because the plaintiff has failed to prove it more likely than not that the injury resulted from the defendant’s negligence. Cangelosi v. Our Lady of Lake Medical Ctr., 564 So.2d 654 (La.1990); Martin v. East Jefferson General Hosp., supra [571 So.2d 895 (La.App. 5th Cir.1990)].
Moore v. Healthcare Elmwood, Inc., 582 So.2d 871, 878 (La.App. 5th Cir.1991). Under this standard, the plaintiffs herein have failed to carry their burden of proving causation.
Additionally, given the inconsistencies in the testimony of the plaintiffs’ witnesses, we find no error in the jury’s decision to credit the testimony of the defendants and their witnesses. As a result, we may not reverse the jury’s factual finding as to liability. See: Rosell v. ESCO, 549 So.2d 840 (La.1989), on remand, 558 So.2d 1360 (La.App. 4th Cir.), writ denied, 561 So.2d 105 (La.1990). Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.